UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ROGER DELANCEY,

                          Petitioner,

           -against-

WILLIAM LEE, *Superintendent of Green
Haven Correctional Facility,*

                        Respondent.
------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
15 CV 891 (RRM) (CLP)

**POLLAK**, United States Magistrate Judge:

On February 17, 2015, petitioner Roger Delancey, proceeding *pro se*, filed a Petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, raising four claims. (Pet.[1]). On May 24, 2019, the Petition was referred to the undersigned to prepare a Report and Recommendation.

For the reasons set forth below, the Court respectfully recommends that the district court deny the Petition in its entirety.

FACTUAL AND PROCEDURAL BACKGROUND

The charges in this case stem from the September 3, 2007 murder of Benny Goodman ("Goodman"), and the shooting of Jerry Germany ("Germany") and Jeffrey Robuste ("Robuste").

A. The Indictment

Petitioner Roger Delancey was arrested on September 24, 2007 in connection with the shooting. Following his arrest, petitioner was indicted in Queens County and charged with one count of Murder in the Second Degree, in violation of New York Penal Law § 125.25[1], one

---

[1] Citations to "Pet." refer to the Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus by a Person in State Custody, filed on February 17, 2015, ECF No. 1.

count of Attempted Murder in the Second Degree, in violation of New York Penal Law §

110.00/125.25[1], two counts of Assault in the First Degree, in violation of New York Penal Law

§ 120.10[1], [4], and one count of Criminal Possession of a Weapon in the Second Degree, in

violation of New York Penal Law § 265.03[3]. (Lasky Aff.[2] ¶¶ 5, 7).

B. The Molineux Hearing

Prior to petitioner's trial, the Honorable Arthur J. Cooperman, Justice of the Supreme

Court of Queens County, held a Molineux hearing to consider the prosecution's application for

permission to introduce evidence of two prior alleged incidents of violence committed by

petitioner.[3] (Tr.[4] at 7). The first incident occurred approximately two to three weeks prior to the

murder, when petitioner got into an argument with Benny Goodman outside his home about why

Goodman was on petitioner's block with his friend; petitioner subsequently fired numerous shots

in Goodman's direction. (Id.). The second incident occurred approximately three hours prior to

the murder on September 3, 2007, when petitioner got into a fist fight with Goodman on Jamaica

Avenue and Archer Avenue and "tried to pull [Benny's] hair out of [his] corn rows." (Id. at 8;

Mem.[5] at 10).

---

[2] Citations to "Lasky Aff." refer to the Affidavit of ADA Merri Tusk Lasky, in Opposition to Petition for Writ of Habeas Corpus, dated April 27, 2015, ECF No. 9.

[3] In the seminal case of People v. Molineux, 168 N.Y. 264, 61 N.E. 286 (N.Y. 1901), the New York Court of Appeals held that evidence of crimes, wrongs or other acts are not admissible to prove that the defendant had a propensity to engage in wrongful acts or that he acted in conformity with the prior conduct on any particular occasion. However, the evidence may be admissible if it is more probative than prejudicial and offered to prove motive, opportunity, intent, preparation, absence of mistake or accident, conduct that is inextricably interwoven with the charged acts, or to provide necessary background information or complete the narrative.

[4] Citations to "Tr." refer to the transcript of the trial proceedings before the state court, commencing on February 23, 2009, contained within the State Court Record, ECF No. 11.

[5] Citations to "Mem." refer to respondent's Memorandum of Law in Opposition to Petition for Writ of Habeas Corpus, attached to the Affidavit of ADA Merri Turk Lasky, in Opposition to Petition for Writ of Habeas Corpus, dated April 27, 2015, ECF No. 9.

During the <u>Molineux</u> hearing, the prosecutor argued that evidence of these incidents was admissible at trial because these incidents established petitioner's motive to commit the murder, were relevant to the issue of identification, completed the narrative of events, provided relevant background information, and explained the nature of the relationship between the parties. (Tr. at 7-12; Mem. at 10).

Petitioner objected to the admission of the evidence of these prior bad acts, arguing that the prosecution had provided no basis for "inclusion" of the first incident, had not given any offer of proof or any indication of who would offer evidence regarding that incident, and had no corroboration or independent proof that the incident actually occurred. (Tr. at 310-11, 313).

On February 25, 2007, the court ruled that the facts and circumstances for both incidents were admissible because the evidence was relevant to issues of identification, to establish the petitioner's motive to commit the crimes charged, to complete the narrative of events surrounding the charged crimes, and to provide relevant and necessary background information. Furthermore, the court ruled that the probative value of the evidence outweighed any potential prejudicial impact. (<u>Id.</u> at 316-18).

C.  <u>Trial Testimony</u>

The trial commenced thereafter on February 23, 2009 before Justice Cooperman. The facts set forth below are derived from the testimony presented during the trial.

1)  <u>Police Officer Michael Boehm's Testimony</u>

At trial, Police Officer Michael Boehm testified that as of September 3, 2007, he was working for the New York City Police Department ("NYPD") and was assigned to the 113th Precinct. (<u>Id.</u> at 340). Officer Boehm testified that at approximately 11:30 p.m., he received a 911 call of an assault in progress and the shooting of two males in the vicinity of Newburg Street

3

and Linden Boulevard. (Id. at 340-341). When Officer Boehm arrived at the location, he

observed two individuals on the ground who had apparently been shot; one had an apparent life-

threatening injury and the other was unconscious. (Id.) The officer approached the individual

who was unconscious on the sidewalk and attempted to wake him, but there was no response.

(Id. at 342-43). Officer Boehm testified that he proceeded to cut off the individual's shirt to

search for any injuries but could only find a small smear of blood on the individual's torso. (Id.

at 343, 349). According to Officer Boehm, the Emergency Medical technicians arrived at the

scene approximately one to two minutes later and determined that the individual had no pulse.

(Id. at 343). The officer helped place the individual, identified as Benny Goodman, into the

ambulance. (Id. at 343-44).

   2) <u>Shawntay Goodman's Testimony</u>

Shawntay Goodman ("Shawntay") testified that prior to September 3, 2007, she was

living with her cousin, Benny Goodman, at 198-19 122 Avenue in Queens County. (Id. at 351,

366). According to Shawntay, her cousin Goodman was "like her brother." (Id. at 352).

Shawntay testified that petitioner, known as "Pop," was also her cousin, but she used to see him

more when she was younger. (Id.) According to Shawntay, there was a time when she,

petitioner, Goodman, Goodman's older brother, Jerry Germany ("Germany"), and Jeffrey

Robuste ("Robuste") would hang out together, although that ended after petitioner's friend killed

a friend of Shawntay's brother. (Id. at 353, 360). Although Robuste was not part of the family,

Shawntay stated that he was a friend of her cousin Jerry Germany. (Id. at 366). Shawntay

further testified that while the rest of her family stopped speaking to petitioner after the incident,

she had no personal problem with petitioner. (Id. at 352, 360).

According to Shawntay's testimony, on September 3, 2007, she, along with friends and

family, picked Benny Goodman up around 11:00 a.m. at Jamaica Avenue to go to the West Indian Day Parade in Manhattan. (Id. at 354-56). Once it turned dark, she and Goodman left the parade and planned to meet at the club Déjà Vu later that night. (Id. at 356). While Goodman stayed at the train station to wait for his brother Germany, Shawntay walked back to her home to get changed before going to Déjà Vu, which was about a 10 to 15-minute walk away. (Id. at 356-57, 385). On her way home, Shawntay saw petitioner coming off her block at 199th Street and noted that he "was mad." (Id. at 357, 359). Shawntay then called Goodman immediately after seeing petitioner to warn Goodman to "be careful" because "Pop" was by the house and he had not been by her home in over three years. (Id. at 359, 360-61). Shawntay testified that she remembered petitioner wearing a dark-colored shirt, dark colored shorts, and a "skully hat," and so she did not recognize him at first. (Id.)

On cross examination, counsel for petitioner questioned Shawntay about her relationship with petitioner, Goodman, Germany, and Robuste. (Id. at 365-66). She explained that she saw Germany around three to four times a week and saw Goodman every day. (Id. at 366). She denied that Goodman's nickname was "Blanco," explaining that his nickname was "Mecca." (Id. at 367).

Defense counsel questioned Shawntay about the "bad blood" that had started after the shooting that occurred between her brother Anthony's friend and petitioner's friend. (Id. at 368). While Anthony and petitioner were not part of the shooting, Shawntay testified that petitioner "could have stopped everything." (Id.) Although she denied being present at the time of the shooting, she testified that her brothers, Kenneth and Anthony, told her about it. (Id. at 369-70). She also denied that she spoke with petitioner about that shooting, and she clarified that after the shooting, there wasn't any "bad blood;" Goodman and petitioner just stopped talking to each

other and "left everything the way it was." (Id.)  Shawntay explained that since the incident, she still saw petitioner around because she continued to hang out with members of his family.  (Id. at 388, 389).  She denied ever hearing her brothers or Goodman make any threats towards petitioner or seeing them go up petitioner's block.  (Id. at 370-71).

Counsel for petitioner asked Shawntay if Goodman was a member of the Bloods.  (Id. at 371, 378).  Shawntay explained that prior to September of 2007, Goodman had been a member of the Bloods, but only for a couple of years.  (Id. at 379).  On redirect, Shawntay clarified that Goodman was in the Bloods gang when he was a teenager and left the gang around June of 2005. (Id. at 389-99).

Petitioner's counsel also questioned Shawntay about where they went after the parade and how she knew Goodman was meeting his brother, Germany, at the train station.  (Id. at 384-85).  She explained that she had heard Germany's voice when Goodman spoke to him on a speaker phone.  (Id. at 385).  She also explained that when she left Goodman at the station, he was by himself.  (Id. at 386).

Counsel also asked Shawntay if she had spoken to petitioner when she saw him walking on her block the evening of September 3, 2007, which she denied.  (Id. at 391).  She testified that petitioner appeared mad, and that she just saw him coming down her block which he never did. (Id. at 392).  She denied seeing petitioner get into a car.  (Id. at 394).  With respect to her phone call to Goodman, she explained that she called to tell him that she had seen petitioner near the house and that the conversation lasted less than a minute.  (Id. at 395, 396).  She denied mentioning anything to Goodman about petitioner having a gun.  (Id. at 396).

3)  Police Officer Angel Rolon's Testimony

Police Officer Angel Rolon also testified for the prosecution.  He testified that he had

been an NYPD officer in the 113th Precinct for about seven years. (Id. at 402-03). On

September 3, 2007, at around 11:35 p.m., Officer Rolon was just completing his tour when he

responded to a radio run regarding two males shot during an assault in progress. (Id. at 407-08).

After arriving on the scene, Officer Rolon blocked off the road and put up tape around the

perimeter of the area to secure the scene. (Id. at 408-09). On cross examination, Officer Rolon

testified that at the time of the radio call, they did not have a name of the complainant or a

description of the man with a gun. (Id. at 411). He further testified that he did not see a male

with a gun and never learned the complainant's name. (Id. at 419).

    4)  Detective Christopher Florio's Testimony

Detective Christopher Florio testified that he was assigned to the Crime Scene Unit, and

that the Crime Scene Unit is responsible for handling homicides, sexual assaults, police-involved

shootings, and citywide crimes. (Id. at 423). When Detective Florio arrived at the scene of the

shooting at approximately 8:00 a.m., on September 4, 2007, he observed that the scene had been

taped off with yellow crime tape; he also saw several articles of clothing on the sidewalk, and

two discharged shell casings. (Id. at 423-24, 425). He photographed the scene, packaged the

evidence,[6] and prepared a diagram showing the layout and the locations of the evidence in

reference to the buildings and the street. (Id. at 427).

    5)  Jerry Germany's Testimony

At trial, Jerry Germany testified that Benny Goodman was his younger brother, and that

Jeffrey Robuste was his best friend of about 13 years. (Id. at 453-54). Germany also testified

that petitioner, known as "Pop," was a family member through marriage, and that he had known

---

[6] According to his trial testimony, Detective Florio recovered two .45 caliber discharged shell casings and three articles of clothing. (Tr. at 427).

petitioner for about 15 years. (Id. at 455). According to Germany, he used to always hang out with petitioner, and the only reason he stopped hanging out with petitioner over the years was because he had "responsibilities." (Id.) Germany also testified about his own criminal convictions; he was previously convicted for the sale of drugs, to which he pleaded guilty, and for criminal trespass. (Id. at 471).

Germany testified that two to three weeks prior to the events on September 3, 2007, he was sitting with Goodman and his two female associates on the front stoop of Goodman's home when "Pop" walked over to the gate. (Id. at 458). According to Germany, Goodman walked over to the gate, at which time, petitioner told Goodman to "stay off the block;" he warned Goodman that the next time he came to the block, he "won't leave the block." (Id. at 459-60). Germany testified that Goodman did not say anything in response to petitioner, but just shook his head and walked away to the backyard. (Id. at 460). According to Germany, as Goodman walked away, petitioner pulled out a gun and fired approximately three to four shots at Goodman before his gun jammed. (Id.) Afterwards, petitioner got into his car and "took off." (Id.) Germany testified that Goodman was not hit or injured, and that they did not call the police. (Id. at 461).

Following Germany's testimony regarding the incident two to three weeks prior to the events of September 3, 2007, the court instructed the jury to avoid considering that evidence for "the purpose of proving that the defendant had a propensity or a predisposition to commit the crimes charged in this case," and to instead use the evidence as consideration for "background information to establish motive, identity, absence of mistake, and to complete the narrative of the event." (Id. at 461-62).

Germany testified that during the evening of September 3, 2007, he was driving with

Robuste in Robuste's car when Germany called Goodman to meet them on Jamaica Avenue at the train station. (Id. at 456, 463). Prior to picking up Goodman from the train station, Germany testified that Germany had been at a bar called Déjà Vu on Linden Boulevard for 45 minutes, but that Germany did not drink anything. (Id. at 462). Germany testified that when he first arrived at Jamaica Avenue, he could not see Goodman and attempted to call him multiple times. (Id. at 456-57). When Goodman finally came to the car, he noticed that Goodman's cornrows were pulled out "like somebody had been pulling on his hair" and he was visibly upset, talking about an incident with "Pop." (Id. at 457). Germany testified that according to Goodman, "Pop" walked up to him and tried to intimidate him, and in response he swung and hit "Pop" which led to a fight. (Id.)

After picking Goodman up at the train station, they drove to Déjà Vu. (Id. at 462). Approximately 15-20 minutes after arriving at the bar, Goodman received a phone call from their cousin Shawntay. (Id. at 463-64). According to Germany, the phone call upset Goodman and he, Goodman, and Robuste went outside the bar to talk. (Id. at 463). Goodman told them that Shawntay said "Pop" was on the side of the house "pacing back and forth." (Id. at 464). Germany also testified that during his conversation with Goodman, he wanted to send him home because Goodman was out on parole and had a curfew, but they could not decide whether to send him home or take him somewhere else. (Id. at 465).

According to Germany, at that point "Pop" came up to them and started to ask Goodman questions to "finish what we started on the avenue" or he would fight Germany and his friends. (Id. at 466). Goodman did not respond to petitioner, but Germany warned petitioner that he "didn't want to fight Benny" and that he had already "had his chance to fight him one on one." (Id. at 467). According to Germany, petitioner did not respond to him, but after a moment,

9

petitioner pulled out a gun and shot Goodman. (Id.) Germany then turned to see Goodman on the floor, holding his stomach, at which point petitioner pointed the gun at Germany and shot him. (Id.) Germany testified that he was shot on the top right side of his back in his right shoulder; he lost consciousness, and was taken to Jamaica Hospital. (Id. at 468). Germany testified that he, Robuste, and Goodman did not have guns on them at the time. (Id. at 472).

At the hospital, Germany was treated for 10 days for a collapsed lung, broken rib, and a gunshot wound to his right shoulder. (Id. at 469). As a result of the gunshot wound, Germany experienced pain in his arm, side, and rib, and had to leave work for 8 months. (Id.) While at the hospital, detectives came to speak with Germany. (Id. at 470). He conceded that he had lied to them about how he got his injuries, telling the detectives that he was robbed at gunpoint. (Id.)

On September 24, 2007, Germany went to the 113th Precinct to view a lineup. (Id. at 472). Germany testified that of the five individuals in the lineup, he recognized petitioner as "Number 2" from growing up with him and for shooting his brother, Goodman. (Id. at 473).

On cross examination, counsel for petitioner questioned Germany regarding the "bad blood" between petitioner and Germany and his brother Goodman. (Id. at 475). Germany testified that it was fair to say that they did not have a good relationship with petitioner, and this "bad blood" went back to an incident a couple years ago involving his other cousin, Anthony. (Id. at 476).

Germany testified that he had spoken to Goodman twice before picking him up at the train station in Robuste's two-door Cadillac. (Id. at 478, 480). When Germany picked up Goodman, Robuste was sitting in the front seat. (Id. at 481). When counsel asked if they called 911 after Benny told Germany about his fight with "Pop," Germany explained that they did not report the incident; they simply left the location. (Id. at 483). Germany also stated clearly that

he knew who "Pop" was.  (Id.)

When asked about the timeline of events leading up to the shooting on September 3, 2007, Germany testified that he was standing on Newburg Street, around the corner from Déjà Vu, on Linden Boulevard.  (Id. at 484-87).  Germany explained that he and Goodman were talking outside Déjà Vu for about five to ten minutes before Robuste joined them, and then they talked for about 20 minutes before "Pop" showed up.  (Id. at 502).  Germany denied that "Pop" had pulled up in a car and denied seeing if he had a gun in his hand.  (Id. at 503).  Germany could not recall which hand "Pop" had the gun in or what clothes he was wearing.  (Id.)

In describing the events that had occurred at Goodman's home two to three weeks prior to the shooting, Germany explained that the conversation between "Pop" and Goodman lasted approximately five minutes.  (Id. at 488).  Although Germany was sitting on the stoop about ten feet from Goodman, and petitioner and Benny were separated by a gate about a foot apart, Germany could hear "Pop" from where he was sitting but he never heard Goodman say anything in response to "Pop."  (Id. at 495).  Germany testified that there were three shots fired before the gun jammed, but that because "Pop" was firing at the side of the house, no damage was done to the house.  (Id. at 491-92, 497).  He did not know what had happened to the casings after Goodman picked them up.  (Id. at 498).

Petitioner's counsel questioned Germany about Benny's involvement with the Bloods gang, and Germany explained that he had only "heard something" about the Bloods but he did not "get into that."  (Id. at 498).  Counsel also asked Germany about the events of September 4, 2007.  (Id.)  Germany confirmed that he told Detective Jordan that he was not interested in helping the police at the time, and that he had been injured in a robbery gone bad.  (Id. at 505-06).  He also confirmed that he went to the precinct two weeks later and told them that "Pop"

was responsible.  (Id. at 507).

6)  Police Officer Alexandros Kalagiros's Testimony

Police Officer Alexandros Kalagiros testified that he was assigned to the Anticrime Unit in the 113th Precinct.  (Id. at 511).  Approximately 11:30 p.m. on September 3, 2007, the officer received a call that two males had been shot at Newburg Street and Linden Boulevard.  (Id. at 513).  When he arrived at the scene, he observed two males who had been shot, on the sidewalk; one was unconscious.  (Id.)  As the first officer on the scene, he secured the area by taping off the block but did not notice any shell casings on the ground at the time he was there.  (Id. at 515, 518).

7)  Jeffrey Robuste's Testimony

Jeffrey Robuste testified that he went to school with Jerry Germany, and that the two of them were "basically like brothers."  (Id. at 521).  Robuste referred to Germany often throughout his testimony as "J," because they "don't use their government names unless its work-wise and stuff like that."  (Id. at 528-29).  Robuste had also known Goodman, Germany's younger brother, since he was "the size of a door knob."  (Id.)

Robuste testified that on September 3, 2007, he got to the bar[7] between 7:40 p.m. and 8:00 p.m. before going with Germany to pick up Goodman at the train station around 8:00 or 8:30 p.m.  (Id. at 522, 536).  Robuste testified that when they picked up Goodman, his hair "was a little bushy," and Goodman told Robuste and Germany that he had gotten into a fight with "Pop."  (Id. at 523).

According to Robuste, after arriving at the bar, Goodman and Germany went outside to talk.  (Id. at 524).  After Robuste joined them outside, they discussed the fight at the train station

---

[7] Jeffrey Robuste testified that he did not remember the name of the bar.  (Tr. at 541).

on Jamaica Avenue for approximately 30 minutes.  (Id. at 525).  Robuste testified that at that point, it was past Goodman's curfew and he had to go home.  (Id.)  Robuste suggested that Goodman come to his home to stay the night.  (Id.)  According to Robuste, in the meantime "Pop" came up the block.  (Id. at 526).  Robuste testified that he had not heard of "Pop" until that evening when Goodman told them about the fight on Jamaica Avenue earlier that day.  (Id.)  Robuste described "Pop" as "a black male, like 5'9["], bald headed, five o'clock shadow, like a little bushy face," wearing "blue jean shorts, a black tee-shirt, and white Uptown sneakers."  (Id.)  He identified petitioner as the individual who approached them on the street on September 3, 2007.  (Id. at 527).

After "Pop" approached the group, Robuste observed Germany, Goodman, and petitioner talking in what appeared to be "arguing back and forth."  (Id.)  According to Robuste, the substance of the argument was "whatever happened on the avenue when they got into a fight." (Id.)  He testified that Germany told petitioner to "leave it alone" because they had "already fought on the avenue."  (Id.)  Robuste also testified that Goodman "was like whatever, whatever," and then "Pop" responded by threatening to "fight your man" and to "just wait a minute, my people is about to come up."  (Id. at 528).  According to Robuste, during this time Goodman was just stepping back and forth and his head was turning.  (Id.)  Robuste then testified that a second later, "Pop" turned to his left side and shot at Goodman.  (Id.)  After shooting at Goodman, "Pop" then turned and shot at Robuste, but the bullet went past his face and hit the flower pot.  (Id.)  Then, "Pop" shot Germany in the back.  (Id.)

Robuste testified that the conversation lasted about 15 to 20 minutes before petitioner pulled out a gun.  (Id. at 529).  During that time, Robuste testified that he could clearly see petitioner's face and that "he could give him a hug if he wanted to."  (Id.)  Petitioner was

standing during the conversation, and Robuste was sitting about five to seven feet away on the flower pot facing petitioner. (Id. at 530). According to Robuste, Germany was also sitting the same distance from petitioner to the left of Robuste, and Goodman was standing at a mailbox about "arms-length" from Robuste. (Id. at 530, 547).

After the shooting, petitioner turned and went north, "going straight up the block," but Robuste did not recall the name of the street. (Id. at 531). Later, during cross examination, Robuste mentioned that the street he saw "Pop" run up was Newburg Street. (Id. at 558).

After petitioner left, Robuste checked to see if he was hit, and then went to Goodman and Germany to check on them. (Id.) According to Robuste, Germany could not feel his leg and Goodman was seizing and going in and out. (Id.) Robuste then dialed 911, and the police and Emergency Medical personnel arrived on scene. (Id. 531-32). Robuste stayed on the scene and spoke with police officers and detectives, giving them a description of the shooter. (Id. at 532). Robuste testified that he described the shooter as "5'9["], five o'clock shadow, facial hair, bald head, a black tee-shirt, blue jean shorts, and white Uptown Nike sneakers." (Id.)

On September 4, 2007, Robuste went to the 113th Precinct to view a lineup of approximately four people. (Id.) Robuste testified that out of the lineup, he recognized Number 2 as the individual who shot Goodman and Germany. (Id. at 533).

On cross examination, counsel for petitioner asked Robuste if they ever called Goodman "Mecca," which the witness denied. (Id. at 534). Robuste, who was then 34 years old, claimed that he had known Germany for about 25 to 30 years, and met him in freshman year of high school when he was 17. (Id.) Robuste also testified that although Robuste had been friends with Germany and went with him to family occasions, he never knew or met "Pop" until the night of the incident. (Id. at 534-35).

When asked on cross examination about the events on September 3, 2007 at the train station, Robuste clarified that once Goodman got into the car, he began talking to Germany about a fight he had gotten into with someone named "Pop." (Id. at 540). Counsel also asked Robuste if he had talked with Shawntay that evening, which the witness denied. (Id. at 540-41).

Counsel questioned if the witness remembered wearing any eyewear that evening, and Robuste explained that he was wearing dark prescription glasses the evening of September 3, 2007. (Id. at 543). According to Robuste, he confirmed that he was wearing the glasses when he viewed the lineup on September 24, 2007, that he wore them all the time, but did not really need them. (Id. at 544). On redirect, Robuste testified that the prescription was for a slight astigmatism; and that he did not need the glasses to see, explaining that once he put the glasses on his eyes would adjust to the glasses, so he would have to keep them on. (Id. at 565).

Petitioner's counsel questioned Robuste about what he did once he got to the bar. (Id. at 542). Robuste explained that once they got to the bar, the three of them went inside and "greeted whoever they greeted out." (Id.) After greeting everyone at the bar, Robuste ordered a drink for himself and Germany, but not for Benny because he did not drink. (Id. at 544). Counsel asked what Germany and Benny were doing at that time, and Robuste explained that when he was ordering drinks, Germany and Benny went outside to talk. (Id. at 545). After a period of 15-20 minutes, Robuste went outside to meet them on Newburg Street. (Id.) Counsel asked if Robuste remembered what time he went outside, but Robuste said he did not remember the exact time. (Id. at 556).

Counsel questioned Robuste about the conversation that occurred after "Pop" approached them outside the bar on September 3, 2007. (Id. at 548). Robuste explained that during this conversation, they were arguing between each other, but Goodman did not say much during the

conversation. (Id. at 548). When counsel asked if Robuste knew the individual who had approached him was "Pop," Robuste denied that he knew "Pop" at the time, but he heard the individual, Goodman, and Germany talking about the past fight. (Id. at 549). Robuste also denied that he ever told Detective Jordan that there was another person involved besides himself, Goodman, Germany, and the individual who had approached them. (Id. at 550).

When asked about the shooting, Robuste explained that while he did not see a gun by the individual's waist when he approached; he had pulled it out of his waist with his right hand when he shot at Goodman. (Id. at 552). Robuste also clarified that while he did not get shot, there were three shots fired and one of them hit the flower pot. (Id. at 552, 553-54). Robuste was cross examined about testimony that he gave before the grand jury regarding bullet fragments, and he stated that he did remember being asked and stating that he saw bullet fragments. (Id. at 561).

8) Detective Joseph Jordan's Testimony

Detective Joseph Jordan testified that he had been a member of the NYPD for over 18 years and had been a detective for over a year, assigned to the 113th Detective Squad, investigating shootings, homicides, and crimes that Patrol does not handle. (Id. at 571). Around 11:45 p.m. on September 3, 2007, Detective Jordan was assigned to investigate a shooting that occurred at the corner of Linden Boulevard and Newburg Street with the victims being identified as Benny Goodman and Jerry Germany. (Id. at 572). When Detective Jordan arrived on the scene, both victims had been removed; crime scene tape was up; the midnight sergeant and a couple of police officers were present; and a sector officer was at the scene. (Id. at 573). The Detective spoke with the midnight sergeant who confirmed that two males had been shot. (Id.) The Detective then spoke with Jeffrey Robuste, who offered the following description of a possible perpetrator: "a male nicknamed 'Pop' about 32 years old, baldy haircut, a small

16

mustache and beard, Nike Uptown sneakers, and armed with a black handgun, and like a seven o'clock shadow for a beard." (Id. at 573-74). After approximately 45 minutes, Detective Jordan went to the victim's home at 198-19 122 Avenue to speak with the victim's aunt, Nelly Goodman. (Id. at 574-75). According to Detective Jordan, he picked Nelly up from her home to see if she knew a person named "Pop." (Id. at 575). Accompanied by Detective McDermott, they drove to three separate locations looking for "the subject." (Id.) After they went to those three locations, Detective Jordan took Nelly to Mary Immaculate Hospital. (Id. at 577).

Detective Jordan thereafter attempted to locate petitioner by running his name to find out associates, domestic incidents, and family. (Id. at 579). He identified several possible addresses for petitioner, and he and other detectives went to these addresses in an effort to locate petitioner. (Id. at 580).

On September 24, 2007, Detective Jordan arrested petitioner at the 113th Detective Squad, after petitioner came in with his attorney.[8] (Id. at 578). Detective Jordan took pedigree information from petitioner, with his arrest reports showing that petitioner was 5'9" and 190 pounds, with an address of 115-36 175 Street, second floor. (Id. at 579). On that same date, Detective Jordan conducted a lineup with petitioner and five other people brought from the Armory. (Id.) Detective Jordan testified that he chose people who had relatively the same hairstyle, skin color, and facial growth as petitioner; petitioner elected to stand in position number 2 in the lineup. (Id.) Detective Jordan also explained that a yellow tarp was used to cover the clothing of the six individuals in the lineup, because "it gives everything the same view of everybody being equal." (Id. at 584).

---

[8] Detective Jordan testified that the attorney petitioner brought to the 113 Detective Squad was the same attorney who represented him during the trial. (Id. at 578).

Two witnesses, Jerry Germany and Jeffrey Robuste, viewed this lineup, and Detective Jordan testified that he had a conversation with both individuals before showing them the lineup. (Id. at 581).  Detective Jordan testified that he told the individuals that he would be showing them a group of people and would ask the following three questions:  1) if they recognized anyone; 2) the number of the person they recognized; and 3) where they recognized the person from.  (Id.)  There was no contact between the five individuals who were brought in from the Armory with the two witnesses prior to viewing the lineup.  (Id. at 582).  During the lineup, trial counsel for petitioner, Assistant District Attorney Travis Hunter, Lieutenant Michelle Kaiser, and Detective Jordan were present.  (Id.)  Detective Jordan testified that he preserved the lineup by taking photographs.  (Id. at 583).

On cross examination, Detective Jordan explained that there was a description of the wanted person in the complaint report, and that description was given to him by Robuste.  (Id. at 585).  (Id.)  When asked, Detective Jordan explained that Detective McDermott filled out the unusual occurrence report, but that Jordan checked it to make sure it was accurate and signed it. (Id. at 589).

Counsel asked Detective Jordan if he remembered how tall petitioner was compared to his own height on September 24, 2007.  (Id. at 590).  Detective Jordan denied remembering exactly how tall petitioner was on that date but stated that "I don't think I looked up at him.  I may have looked a little down."  (Id.)  As to petitioner's physical appearance on September 24, 2007, Detective Jordan explained that petitioner appeared to be 180-190 pounds and "close to being bald."  (Id. at 591).  The officer confirmed that during the time between his arrest at 8:30 a.m., and the lineup at 4:50 p.m., petitioner was in the custody of the NYPD, and his appearance did not change.  (Id.)  Counsel questioned Detective Jordan about the five fillers for the lineup.

(Id. at 593-95).

Counsel questioned Detective Jordan about the crime scene on September 3, 2007. (Id. at 598). Detective Jordan denied conducting a canvass of the area for any individual seen fleeing, or heading with Robuste in any direction to pick up a canvass with him. (Id. at 598). Detective Jordan denied entering the Déjà Vu bar. (Id. at 601). According to Detective Jordan, he only spoke to Robuste at the scene, and did not recall speaking to him at the precinct on September 4, 2007. (Id. at 603). Detective Jordan confirmed that he prepared a Criminal Court complaint in relation to the arrest of petitioner. (Id. at 601).

9) Police Officer Aaron Lohman's Testimony

Police Officer Aaron Lohman testified that he had been a member of the NYPD for two and a half years and was assigned to the 113th Precinct Conditions Unit for approximately four months. (Id. at 608). As a part of the Conditions Unit, Officer Lohman was assigned to patrol and handle quality of life offenses. (Id.)

At approximately 7:00 a.m. on September 4, 2007, Officer Lohman received an assignment to sit and guard a crime scene at the intersection of Newburg Street and Linden Boulevard in Queens County. (Id. at 609). Officer Lohman testified that when he arrived at the crime scene, he was told to voucher shell casings which he received packaged in a sealed plastic bag from Detective Florio. (Id. at 609-10). Officer Lohman took them back to the precinct where he prepared a voucher for them, along with two items of clothing. (Id. at 610, 613).

10) Detective John Kraljic's Testimony

Detective John Kraljic testified that he had been a member of the NYPD for approximately 15 years. (Id. at 615). He testified that he is a firearms examiner, and he identifies and tests the operability of firearms, restores serial numbers on firearms which have

been defaced, and conducts microscopic examinations of ballistic evidence. (Id.)

Detective Kraljic testified that on January 27, 2009, he conducted a microscopic examination on two cartridge casings seized as evidence from the scene of the shooting and determined that they were fired from the same gun. (Id. at 618, 623). He explained that the discharged casings have unique marks depending on the gun they are fired from, and those markings are compared between shell casings to determine if they were fired from the same gun. (Id. at 623, 627). He also explained that prior to examining the shell casings himself, they were reviewed by several other detectives between September 22, 2007 and January 27, 2009. (Id. at 620-21).

Detective Kraljic noted that he did not know exactly which gun the two cartridge casings came from because there was no firearm submitted for analysis. (Id. at 626, 629). He explained that in order to determine which firearm the casings came from, he would need to test fire the firearm to be able to compare the test fire casings with the shell casings already in evidence. (Id. at 627).

11)  Doctor Jason Graham's Testimony

Doctor Jason Graham testified that he is a forensic pathologist with the Office of Chief Medical Examiner for the City of New York, board certified in Anatomic and Forensic Pathology. (Id. at 631, 633). On September 5, 2007, he conducted an autopsy on an individual identified as Benny Goodman. (Id. at 635-36). Upon external examination, he observed a single gunshot wound to Goodman's torso that entered the left lower side of his abdomen and exited on his right buttocks. (Id. at 637). From his internal examination, he was able to determine that the bullet travelled through the torso, abdomen, and pelvis, which injured those structures. (Id. at 640). As a result, Doctor Graham observed major injuries to the iliac artery and vein, colon,

small intestine, and deep muscle body. (Id.) Doctor Graham also testified that from his evaluation, there was a significant amount of blood loss associated with the gunshot wound pathway. (Id. at 641, 648). He also testified that to a degree of scientific certainty, a gunshot wound to the torso led to the death of Benny Goodman. (Id.)

At the conclusion of the testimony, petitioner's counsel made a motion to dismiss, arguing that the prosecution had not made a prima facie case against petitioner and asking that all counts of the indictment be dismissed. (Id. at 651). The trial court denied the motion, ruling that the trial evidence was legally sufficient to establish the offenses charged in the indictment. (Id.) The lawyers summed up before the jury. (Id. at 659, 661).

On March 6, 2009, the jury returned a verdict of guilty on the charges of Murder in the Second Degree, Attempted Murder in the Second Degree, Assault in the First Degree, and Criminal Possession of a Weapon in the Second Degree. (Lasky Aff. ¶¶ 6, 7).

D. The Direct Appeal

In November 2010, petitioner's counsel, Lynn W.L. Fahey, Esq., filed a direct appeal from the judgment of conviction to the Appellate Division, Second Department, claiming that the court erred in admitting evidence of two alleged prior acts of violence. (Lasky Aff. ¶ 8; Appeal Br.[9] at 2). Counsel argued that the minimal probative value of the two alleged prior acts of violence against Goodman was far outweighed by the prejudicial impact of the testimony. (Appeal Br. at 13). She contended that because the jury determined petitioner's guilt based upon his alleged propensity for wrongdoing, the introduction of the other prior bad act evidence deprived petitioner of a fair trial. (Id. at 14).

---

[9] Citations to "Appeal Br." refer to the Brief for Defendant-Appellant, dated November 2010, ECF No. 11-5.

On May 22, 2011, petitioner filed a Supplemental *Pro Se* Brief as part of his direct appeal, in which he submitted four additional claims. (Supp. Appeal Br.[10]).  Petitioner claimed that the jury's verdict was against the weight of the evidence and that the State had failed to prove his guilt beyond a reasonable doubt. (Id. at 55).  He also argued that the evidence failed to demonstrate that petitioner intended to kill Goodman.  (Id. at 62; Lasky Aff. ¶ 11).  Petitioner also claimed that he was denied the right to a fair trial because of the admission of testimony that "bolstered" the identification evidence and the admission of hearsay which violated petitioner's right to confrontation.  (Lasky Aff. ¶ 11; Supp. Appeal Br. at 65).  Furthermore, petitioner claimed that he was denied the effective assistance of trial counsel because:  1) counsel failed to request that the court instruct the jury on any lesser included offenses or consult with petitioner prior to making that decision; 2) counsel failed to object when the prosecutor allegedly elicited prejudicial testimony regarding a prior incident; 3) counsel failed to preserve petitioner's Molineux claim for appellate review; and 4) counsel failed to move for a mistrial or seek curative instructions with regard to the prosecutor's summation remarks.  (Lasky Aff. ¶ 11; Supp. Appeal Br. at 71-77).  In addition, petitioner claimed that he was denied his right to a fair trial due to the prosecutor's allegedly inappropriate summation remarks.  (Lasky Aff. ¶ 11; Supp. Appeal Br. at 78).

On April 17, 2012, the Appellate Division, Second Department, affirmed the trial court's judgment of conviction.  People v. Delancey, 94 A.D.3d 1015, 942 N.Y.S.2d 170 (2d Dep't 2012).[11]  The Appellate Division held that "the testimony regarding two prior disputes . . . was

---

[10] Citations to "Supp. Appeal Br." refer to the Supplemental *Pro Se* Brief, dated May 22, 2011, ECF No. 11-5.  The page numbers for the "Supp. Appeal Br." reflect the page number shown on the Docket, ECF No. 11-5, as the original document does not have page numbers.

[11] Opinion available on ECF as No. 11-5.

relevant to his motive and provided background information on the nature of the relationship between the defendant and the victims, and the probative value of the evidence outweighed any prejudice to the defendant." Id., 94 A.D.3d at 1016, 942 N.Y.S.2d at 171 (internal citations omitted). The court further stated that, "upon reviewing the record here, we are satisfied that the verdict . . . was not against the weight of the evidence." Id. (citations omitted). In addition, the court found that petitioner's claim that he was deprived of his right to effective counsel constitutes a "mixed claim" of ineffective assistance of counsel. Id. (citations omitted). The court also found that "it is not evident from the matter appearing on the record that the defendant was deprived of . . . effective assistance of counsel," and a New York Criminal Procedure Law § 440.10 proceeding would be appropriate to review this claim in its entirety. Id., 94 A.D.3d at 1017, 942 N.Y.S.2d at 172 (internal citations omitted). The court found that the remaining claims raised by petitioner on appeal were "unpreserved for appellate review" and "without merit." Id.

On July 30, 2012, petitioner's application to appeal to the Court of Appeals was denied. People v. Delancey, 19 N.Y.3d 972, 973 N.E.2d 765, 950 N.Y.S.2d 355 (N.Y. 2012).

E. The Motion to Vacate Judgment

By motion dated July 26, 2013, and a supplemental motion dated September 3, 2013, petitioner moved pro se to vacate the judgment of conviction pursuant to New York Criminal Procedure Law Section 440.10(1)(h),[12] arguing that he was denied the effective assistance of counsel because his attorney: 1) failed to adequately advise petitioner with regard to a plea offer and failed to advise him of his options in pleading guilty to the indictment; 2) failed to request

---

[12] Criminal Procedure Law Section 440.10(l)(h) states that a court may vacate a judgment if it "was obtained in violation of a right of the defendant under the constitution of this state or of the United States." N.Y. CRIM. PROC. § 440.10(l)(h).

that the court advise the jury of any applicable lesser included offenses, and failed to consult with the petitioner about the possibility of submitting lesser included offenses to the jury; 3) failed to file appropriate motions, conduct pretrial investigations, and present a defense for the petitioner; and 4) failed to object to the court's jury instructions. (Lasky Aff. ¶ 11; Pet. 440 Motion;[13] Pet. 440 Motion Add.[14]).

On December 5, 2013, the trial court denied petitioner's motion to vacate the judgment and set aside the sentence. (12/5/13 Order[15]). The court found that petitioner's claims were "procedurally barred" and that "no hearing is warranted," pursuant to N.Y. CRIM. PROC. §§ 440.10(2)(c), 440.30(4)(b), and (4)(d). (Id. at 3) (citations omitted). As to the issues raised by petitioner concerning the conduct of trial counsel which did not appear on the record, the court determined that petitioner's allegations were unsupported by factual recitation, affidavit, or other evidence. (Id. at 4). Specifically, the court noted that the trial record clearly stated that a plea offer was made and rejected by petitioner; thus, petitioner "bases his assertions only upon his own allegations and nothing further." (Id.) With respect to petitioner's claims that he received ineffective assistance of counsel, the court held that these claims were meritless. (Id. at 6). Specifically, the court found that petitioner had failed to demonstrate "the absence of strategic or other legitimate explanations for counsel's actions," or that "counsel's deficient performance prejudiced him" under the two-part Strickland test.[16] (Id. at 5 (citations omitted)).

---

[13] Citations to "Pet. 440 Motion" refer to the Notice of Motion and accompanying Affidavit in Support, filed *pro se* by petitioner, dated July 26, 2013, ECF 11-5.

[14] Citations to "Pet. 440 Motion Add." refer to the Affidavit/Addendum in support of Motion, filed *pro se* by defendant, dated September 3, 2013, ECF 11-6.

[15] Citations to "12/5/13 Order" refer to the Opinion, Decision, and Order of the state trial court, dated December 5, 2013, denying petitioner's July 26, 2013 and September 3, 2013 motions pursuant to New York Criminal Procedure Law § 440.10/440.20, ECF No. 11-5.

[16] The Strickland test is a federal standard that requires a defendant seeking to raise a claim of ineffective assistance of counsel to demonstrate that his counsel's performance was so

On January 15, 2015, the Appellate Division, Second Department, denied petitioner's request for leave to appeal from the trial court's denial of his § 440 motion.  (Lasky Aff. ¶ 18).

F.   The Current Habeas Corpus Petition

On February 17, 2015, petitioner, proceeding *pro se*, filed a Petition for a writ of <u>habeas corpus</u> in this Court.  (Pet.).  The Petition raises four claims:  1) the trial court erred in admitting evidence of petitioner's prior bad acts; 2) Detective Jordan's testimony improperly bolstered the State's identification evidence; 3) petitioner was deprived of his right to a fair trial by the prosecutor's summation comments; and 4) petitioner was denied the effective assistance of trial counsel because counsel failed to:  a) request the submission of a lesser included offense; b) object to testimony regarding a prior incident; c) object to the court's <u>Molineux</u> ruling; d) move for a mistrial or seek curative instructions; and e) convey a plea offer or advise petitioner during plea negotiations.  (<u>Id.</u>)

Respondent submitted an Affidavit and Memorandum of Law in Opposition to Petition for Writ of <u>Habeas Corpus</u>, urging the Court to deny the Petition in its entirety because petitioner's challenge to the admission of evidence of prior bad acts does not present a federal constitutional question.  (Lasky Aff. ¶ 20; <u>see also</u> Mem.).  Furthermore, respondent argues that petitioner's challenge to Detective Jordan's testimony and petitioner's challenge to the prosecutor's summation comments are both procedurally barred from review by an adequate and independent state ground.  (<u>Id.</u>)  Petitioner's claim of ineffective assistance of trial counsel is also partially procedurally barred from this Court's review by an adequate and independent state procedural ground.  (<u>Id.</u>)

---

deficient that his counsel was not functioning within the meaning of the Sixth Amendment to the United States Constitution, and that his counsel's deficient performance prejudiced him. <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

DISCUSSION

I.    <u>Timeliness of Petition</u>

This <u>habeas</u> Petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1214 (codified as amended in scattered sections of the United States Code), which provides that a "1-year period of limitation shall apply to an application for a writ of <u>habeas</u> <u>corpus</u> by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2244(d)(1).  This limitation, absent certain exceptions that do not apply to this case, runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).  A conviction is deemed final for AEDPA purposes when the defendant's time to seek certiorari before the United States Supreme Court has expired.  <u>See</u> <u>Williams v. Artuz</u>, 237 F.3d 147, 151 (2d Cir. 2001).[17]  Moreover, any "time during which a properly filed application for State post-conviction or other collateral review . . . is pending" is excluded from the calculation of the statute of limitations period.  28 U.S.C. § 2244(d)(2).

Petitioner's direct appeal to the Appellate Division was denied on April 17, 2012 (<u>see</u> Lasky Aff. ¶ 13 (citing <u>People v. Delancey</u>, 94 A.D.3d at 1015)), and petitioner's application for leave to appeal to the Court of Appeals was denied on July 30, 2012.  (<u>See</u> <u>Id.</u> ¶ 14 (citing <u>People v. Delancey</u>, 19 N.Y.3d at 972)).  Under Rule 13 of the Rules of the Supreme Court of the United States, petitioner's conviction became final 90 days after petitioner's motion for leave to appeal to the Court of Appeals was denied, on October 28, 2012.[18]

---

[17] If the defendant files a petition with the United States Supreme Court, the conviction is final when certiorari proceedings have concluded.  <u>Williams v. Artuz</u>, 237 F.3d at 151.

[18] A petition for a writ of certiorari is timely when filed within 90 days after entry of judgment of a state court of last resort or a United States court of appeals.  Sup. Ct. R. 13.  Petitioner did not seek such relief.

Thus, the statute of limitations applicable to petitioner's <u>habeas</u> Petition would have expired on October 28, 2013, one year after the period for petitioner to seek Supreme Court review expired, but since he filed his initial motion to vacate the judgment pursuant to Criminal Procedure Law Section 440.10 on July 26, 2013, the time for filing the <u>habeas</u> Petition was stayed until January 5, 2015, when the Appellate Division denied petitioner's motion for leave to appeal from the denial of his motion to vacate the judgment.  Petitioner thereafter filed his initial <u>habeas</u> Petition on February 17, 2015, and therefore, his Petition was timely filed before this Court.

II.    <u>AEDPA Standards</u>

Under 28 U.S.C. § 2254, as amended by AEDPA, the authority of federal courts to grant writs of <u>habeas</u> <u>corpus</u> on the merits of claims filed by state prisoners is limited to instances in which it can be shown that the adjudication of a claim on the merits in state court:  1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or 2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

In <u>Williams v. Taylor</u>, the Supreme Court indicated that the "contrary to" and "unreasonable application" clauses of Section 2254(d)(1) have independent meanings.  529 U.S. 362, 404-05 (2000).  Under the first prong, a state court decision is considered to be "contrary to" clearly established federal law where the state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or where the state court "confronts a set of facts that are materially indistinguishable" from those considered by the Supreme Court, but "nevertheless arrives at a result different from [Supreme Court] precedent."  <u>Id.</u> at 405-06;

27

accord Evans v. Fischer, 712 F.3d 125, 132B33 (2d Cir. 2013); King v. Greiner, 453 F. App'x 88, 89 (2d Cir. 2011).  The precedent providing guidance in this analysis are "'the holdings, as opposed to . . . dicta" of the Supreme Court's decisions at the time of the state court decision. Contreras v. Artus, 778 F.3d 97, 110 (2d Cir. 2015) (quoting Williams v. Taylor, 529 U.S. at 412).

Under the "unreasonable application" prong of Section 2254(d)(1), a state court decision will be set aside if it involves an "unreasonable application" of the correct governing legal rule to the particular facts of the case, see Williams v. Taylor, 529 U.S. at 407, 409; King v. Greiner, 453 F. App'x at 89; Evans v. Fischer, 712 F.3d at 133, or if the decision "refuses to extend a legal principle that the Supreme Court has clearly established to a new situation in which it should govern." Emmons v. Artus, 494 F. App'x 127, 128 (2d Cir. 2012) (quoting Hoi Man Yung v. Walker, 468 F.3d 169, 176 (2d Cir. 2006)).  In conducting this analysis, the appropriate inquiry is whether the decision was objectively unreasonable, not merely whether it was incorrect or erroneous.  Williams v. Taylor, 529 U.S. at 409-11.

The Supreme Court has made it clear that review under Section 2254(d) is extremely narrow.  The Court has stated that habeas corpus is "'a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.'" Woods v. Donald, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) (quoting Harrington v. Richter, 562 U.S. 86, 102-03 (2011)).  A habeas court must first determine the theories that formed the basis of the state court's decision, then ask whether "fairminded jurists could disagree" that those theories were inconsistent with a prior Supreme Court decision.  Harrington v. Richter, 562 U.S. at 101.  A habeas petitioner must show that the state court's ruling was "so lacking in justification" that there was an error in existing law that is "beyond any possibility for

fairminded disagreement." Id. at 103. This standard is intentionally difficult to meet. Id. at 102.

Under AEDPA, a state court's determination of a factual issue is "presumed to be correct," 28 U.S.C. § 2254(e)(1); Sarcina v. Artus, 452 F. App'x 44, 46 (2d Cir. 2011), and the petitioner has the "burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Moreover, "a decision adjudicated on the merits in a state court and based on a *factual* determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) (citing 28 U.S.C. § 2254(d)(2)) (emphasis added).

III.    Exhaustion of Petitioner's Claims

Before considering the merits of each of petitioner's claims, this Court must first determine if petitioner has exhausted all available state remedies and whether federal habeas review is permissible.

A federal court may not grant a petition for a writ of habeas corpus unless a petitioner has exhausted all available state court remedies. See 28 U.S.C. § 2254(b)(1)(A); Picard v. Connor, 404 U.S. 270, 275-76 (1971); Richardson v. Superintendent of Mid-Orange Corr. Facility, 621 F.3d 196, 201 (2d Cir. 2010); Galdamez v. Keane, 394 F.3d 68, 72 (2d Cir. 2005); Aparicio v. Artuz, 269 F.3d 78, 89 (2d Cir. 2001); Vittor v. New York State Dep't of Corr. and Cmty. Supervision, No. 13 CV 3112, 2014 WL 1922835, at *3 (E.D.N.Y. May 14, 2014). This rule, based on principles of comity between state and federal courts, requires that the state have "the first opportunity to address and correct alleged violations of state prisoner's federal rights." Coleman v. Thompson, 501 U.S. 722, 731 (1991); accord Picard v. Connor, 404 U.S. at 275-76. "To fulfill the exhaustion requirement, a petitioner must have presented the substance of his

federal claims 'to the highest court of the pertinent state.'" Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994) (quoting Pesina v. Johnson, 913 F.2d 53, 54 (2d Cir. 1990)), cert. denied, 115 S. Ct. 1436 (1995)). "'In order to have fairly presented his federal claim to the state courts[,] the petitioner must have informed the state court of both the factual and the legal premises of the claim he asserts in federal court.'" Rush v. Lempke, 500 F. App'x 12, 14 (2d Cir. 2012) (quoting Daye v. Attorney Gen. of State of New York, 696 F.2d 186, 191 (2d Cir. 1982) (en banc)).

A habeas petitioner satisfies the exhaustion requirement if he has presented his claim to the appropriate state courts in accordance with state procedural requirements, and has thereby "afford[ed] the state courts a meaningful opportunity to consider [the] allegations of legal error." Vasquez v. Hillery, 474 U.S. 254, 257 (1986) (citations omitted). Although some courts have insisted upon citation in the state pleadings to a specific clause of the Federal Constitution that is alleged to have been violated, courts in this Circuit have held that a claim may be "fairly present[ed] to the state courts . . . without citing chapter and verse of the Constitution" if there is: "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis [in factually similar circumstances], (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." Daye v. Attorney Gen. of State of New York, 696 F.2d at 194; accord Carvajal v. Artus, 663 F.3d 95, 104 (2d Cir.), cert. denied, 132 S. Ct. 265 (2011); Jones v. Vacco, 126 F.3d 408, 413-14 (2d Cir. 1997) (holding that "[c]itation to a specific constitutional provision or rel[iance] on federal constitutional precedents alerts state courts of the nature of the claim"); Williams v. Lord, 996 F.2d 1481, 1483 (2d Cir. 1993) (holding that petitioner had fully presented her claim to the state court where, "[a]lthough she did not cite specific constitutional provisions in her [state

court] brief[,] . . . she explicitly asserted her constitutional right to present a defense . . . [and] cited a leading Supreme Court case in this area"), cert. denied, 510 U.S. 1120 (1994).

The legal claims raised in the state courts must also be the "substantial equivalent" of the claims raised in the federal petition. See Picard v. Connor, 404 U.S. at 278; accord Jones v. Murphy, 694 F.3d 225, 247 (2d Cir. 2012); Waterhouse v. Rodriguez, 848 F.2d 375, 381 (2d Cir. 1988) (noting that "[t]he legal theory relied upon in the federal court need not . . . be identical to the legal theory presented to the state courts, provided that the essential factual allegations and the ultimate constitutional question raised in the federal petition were presented to the state courts"). Once a federal claim has been properly presented to the state courts, the claim is considered exhausted even if the state court did not address the claim on the merits and instead rejected it on a state procedural ground, or did not rule on the claim on either substantive or procedural grounds, but nonetheless had a fair opportunity to address the claim. See, e.g., Coleman v. Thompson, 501 U.S. at 731-32.

When Mr. Delancey's habeas Petition was filed in February 2015, all claims had been properly exhausted in state court proceedings. (See discussion infra, Section V).

IV.    Procedural Default

As a separate and distinct issue, the Court must also address whether there was a procedural default with respect to any of the claims in the state proceedings. See Engle v. Isaac, 456 U.S. 107, 129 (1982); Francis v. Henderson, 425 U.S. 536, 542 (1976). "A defendant whose claim is rejected in state court for failure to comply with a state procedural rule may be precluded from raising that claim on habeas review in federal court." Petronio v. Walsh, 736 F. Supp. 2d 640, 652 (E.D.N.Y. 2010) (citing Coleman v. Thompson, 501 U.S. at 729-30; Garcia v. Lewis, 188 F.3d 71, 79 (2d Cir. 1999)). Thus, even if a petitioner raises a colorable federal

claim, habeas review is barred if the claim was rejected in the state court on a procedural ground that is both "'independent' of the merits of the federal claim" and provides an "'adequate' basis for the court's decision." Id. (quoting Fernandez v. Smith, 558 F. Supp. 2d 480, 489 (S.D.N.Y. 2008)).

Here, the state courts have found that petitioner's claims of ineffective assistance of trial counsel were procedurally barred because petitioner did not properly conform to the state's statutes. The state court found that the remaining claims raised by petitioner were unpreserved for appellate review. Where the state court relied on a procedural default in rejecting petitioner's claims, this Court has examined the merits of the claims regardless, and in each instance found that the claims are, in any event, without merit. (See discussion infra at 51-60).

V.    Petitioner's Claims

   A.    Ground One – The Court Erred in Admitting Evidence of Uncharged Crimes

Petitioner's first claim for habeas relief is that the trial court erred in admitting evidence of uncharged crimes, and that "the People introduced evidence of two alleged prior acts of violence including a shooting that had little probative value." (Pet. at 8). This claim was raised in petitioner's Brief for Defendant-Appellant, which this Court refers to for further details regarding petitioner's claims. (See Appeal Br. at 13).

In support of this claim, petitioner argues that the trial court erred in admitting evidence of two prior alleged bad acts of petitioner. The first occurred approximately two to three weeks before the murder, when petitioner allegedly pulled out a gun and shot at Goodman; the second occurred a few hours before the murder, when petitioner allegedly approached Goodman at the train station and the two engaged in a fistfight. (Appeal Br. at 6, 7). Petitioner contends that admission of this evidence denied him a fair trial because the jury determined his guilt based on

his "alleged propensity for wrongdoing," and not on the facts and evidence of the crimes charged. (Id. at 13-14). Petitioner also argues that admitting the evidence posed a danger that the jury would assume petitioner to be guilty based on the similarity in conduct between the prior acts of violence and the charged crimes. (Id. at 15). In any event, petitioner argues that whatever minimal probative value this evidence may have had was outweighed by significant prejudice. (Id. at 19).

The Appellate Division held on direct appeal that the evidence was properly admitted under certain exceptions to the Molineux rule. People v. Delancey, 94 A.D.3d at 1016, 942 N.Y.S.2d at 171. The court found that, contrary to petitioner's claim, the evidence was properly admitted because it was relevant to petitioner's motive, provided background information on the nature of the relationship between petitioner and the victims, and the probative value outweighed any potential prejudice to petitioner. (Id.) Furthermore, the evidence was relevant because the two prior bad acts involved the same individuals as the charged murder and related offenses, and explained to the jury the sequence of events leading up to the shooting. (Id.)

In conducting habeas review, the federal courts are limited to deciding whether a conviction violates the Constitution, laws, or treaties of the United States, and it is well established that "federal habeas corpus relief does not lie for errors of state law." Estelle v. McGuire, 502 U.S. 62, 67 (1991) (quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990). A habeas petitioner asserting a claim based on an alleged erroneous state court evidentiary ruling must demonstrate that the evidentiary error violated an identifiable constitutional right and was "so extremely unfair that its admission violates fundamental conceptions of justice." Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998) (internal citations omitted); see also Rosario v. Kuhlman, 839 F.2d 918, 924 (2d Cir. 1988) (holding that the habeas court must determine

whether the state court's evidentiary ruling was "an error of constitutional dimension"); Collins v. Scully, 755 F.2d 16, 18 (2d Cir. 1985) (holding that a habeas petitioner is entitled to relief only if he shows that "an evidentiary error deprived the defendant of due process" and that "the error was so pervasive as to have denied him a fundamentally fair trial").

The decision "to admit evidence of a criminal defendant's uncharged crimes or bad acts under Molineux constitutes an evidentiary ruling based on state law." Sierra v. Burge, No. 06 CV 14432, 2007 WL 4218926, at *5 (S.D.N.Y. Nov. 30, 2007). Generally, a state court's Molineux ruling is thus not cognizable on habeas review. See Roldan v. Artuz, 78 F. Supp. 2d 260, 276 (S.D.N.Y. 2000). A habeas claim asserting a right to relief on Molineux grounds must rise to the level of constitutional violation, because Molineux deals with state law evidentiary issues. Rodriguez v. Superintendent, Collins Corr. Facility, 549 F. Supp. 2d 226, 244 (N.D.N.Y. 2008).

Thus, the first step in the analysis of petitioner's Molineux claim is to determine whether the state court decision violated a state evidentiary rule; if the state court properly applied a presumptively constitutional state evidentiary rule, then there can be no constitutional violation. See, e.g., Jones v. Stinson, 94 F. Supp. 2d 370, 391-92 (E.D.N.Y. 2000) (holding that once the habeas court has found that the state court evidentiary ruling was proper under state law, there is no need to apply a constitutional analysis), rev'd on other grounds, Jones v. Stinson, 229 F.3d 112 (2d Cir. 2000); Brooks v. Artuz, 97 CV 3300, 2000 WL 1532918 at *6, 9 (S.D.N.Y. Oct. 17, 2000) (denying writ where the petitioner had failed to demonstrate an error under the state evidentiary law, "much less" an error of constitutional magnitude).

The second step in the analysis requires the court to determine whether the state evidentiary error violated an identifiable constitutional right. While the introduction of unfairly

prejudicial evidence against a defendant in a criminal trial is contrary to both state law and federal law, "not all erroneous admissions of such evidence are errors of constitutional dimension." Tobias v. Portuondo, 367 F. Supp. 2d 384, 391 (W.D.N.Y. 2004). This is a "heavy burden, for generally, rulings by state trial courts on evidentiary issues, even if erroneous, do not rise to the level of a constitutional violation." Bonet v. McGinnis, No. 98 CV 6529, 2001 WL 849454 at *2 (S.D.N.Y. July 27, 2001) (internal quotations and citations omitted).

An erroneous state evidentiary ruling that is asserted to be a constitutional violation will then warrant habeas relief only "where petitioner can show that the error deprived [him] of a fundamentally fair trial." Rosario v. Kuhlman, 839 F.2d at 925 (quoting Taylor v. Curry, 708 F.2d 886, 891 (2d Cir. 1983)); see Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998) (holding that "[t]he introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice'") (quoting Dowling v. United States, 493 U.S. 342, 352 (1990)).

In this case, the Appellate Division upheld the trial court's decision to admit testimony of the two prior incidents as proper under Molineux. Thus, under the deferential standard set by AEDPA, this Court's analysis is limited to determining whether the appellate court's affirmation of the trial court's ruling constituted an unreasonable application of clearly established federal law.

Under New York law, evidence of prior bad acts is admissible to prove the specific crime charged when the evidence tends to establish "(1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; [or] (5) the identity of the

person charged with the commission of the crime on trial." People v. Molineux, 168 N.Y. at 293, 61 N.E. at 294. New York courts often admit evidence of prior bad acts and uncharged crimes "as background material" and to "complete the narrative of events." Charles v. Fischer, 516 F. Supp. 2d 210, 217 (E.D.N.Y. 2007) (citing People v. Till, 87 N.Y.2d 835, 836-37, 661 N.E.2d 153, 153, 637 N.Y.S.2d 681, 681 (N.Y. 1995)) (finding that "such evidence may be allowed when, as here, it bears on the motive and state of mind in relation to an avoidance of apprehension during immediate flight from a crime and is found to be needed as background material or to complete the narrative of the episode") (internal quotations omitted). Therefore, New York law establishes that it is "well settled that 'where the evidence of prior, uncharged criminal conduct has a bearing upon a material aspect of the People's case other than the accused's general propensity toward criminality . . . the probative value of the evidence justified its admission, notwithstanding the potential for incidental prejudice.'" People v. Lee, 284 A.D.2d 412, 726 N.Y.S.2d 284 (2d Dep't 2001) (holding that evidence of the defendant's prior assault on the victim was properly admitted at his murder trial because the evidence that he "previously assaulted the victim was admissible to establish his motive and intent").

In determining the balance between the probative value and prejudicial impact of evidence, the decision is left to the sound discretion of the trial judge. See, e.g., People v. Washington, 233 A.D.2d 684, 687-88, 650 N.Y.S.2d 334, 338 (3d Dep't 1996) (holding that it "is within the discretion of the Trial Judge to decide whether the probative worth of the evidence of other crimes on the issue of defendant's credibility outweighs the risk of unfair prejudice to him") (internal citations omitted), appeal denied, 89 N.Y.2d 1042, 659 N.Y.S.2d 873, 681 N.E.2d 1320 (N.Y. 1997). For example, in Jamison v. Grier, the district court, in reviewing petitioner's habeas claim, held that the state trial court did not err in exercising its discretion to

admit evidence of prior bad acts.  No. 01 CV 6678, 2002 WL 100642 at *17 (S.D.N.Y. Jan. 25, 2002).  The court stated that the trial court's admission of evidence was "not an abuse of discretion and thus not an error of state law, much less an error of constitutional magnitude." (Id.)

Based on a review of the evidence presented during the trial and the trial court's analysis of the relevance and probative value of the two prior incidents, this Court finds nothing to suggest that the trial court violated the state evidentiary rule as set out in Molineux.  In exercising its discretion to admit the evidence of petitioner's prior confrontations with the victim, the court found that the evidence was relevant to showing petitioner's motive for the shooting – namely, the ongoing dispute between him and Goodman – and was also relevant to provide background evidence and complete the narrative of events that led up to the final shooting.  The court also properly considered the probative value and any potential prejudice of this evidence and gave an instruction to the jury as to how to consider the evidence.  Thus, the Court concludes, as did the Appellate Division, that the trial court's actions in this case were not an abuse of discretion and not a violation of the state's evidentiary rule. See Thomas v. Breslin, No. 01 CV 6657, 2002 WL 22015 at *5 n.14 (S.D.N.Y. Jan. 9, 2002).

Since petitioner's claim fails to establish an error under state law, he also fails to establish that his constitutional rights were violated as a result of the admission of this evidence by the trial court.  See Green v. Herbert, No. 01 CV 11881, 2002 WL 1587133, at *12 (S.D.N.Y. Jul. 18, 2002) (holding that "the first step in this analysis is to determine whether the state court decision violated a state evidentiary rule, because the proper application of a presumptively constitutional state evidentiary rule would not be unconstitutional") (internal citations omitted).  However, even if the trial court's Molineux ruling were erroneous, which the Court has not

found to be the case, petitioner has failed to demonstrate that the evidentiary error violated an identifiable constitutional right and that the admission of evidence of the prior bad acts was so prejudicial as to deprive petitioner of a fundamentally fair trial.

Petitioner has not cited any authority to support a claim that admission of evidence of prior bad acts or crimes violates the federal constitution. In Estelle v. McGuire, the Supreme Court stated: "we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime." 502 U.S. at 75 n. 5. Lower federal courts following that decision have rejected habeas claims based on the argument that introduction of evidence of uncharged crimes violated a defendant's due process rights, because no federal constitutional violation had been established. See Vega v. Walsh, 669 F.3d 123, 126 (2d Cir. 2012); Doumbia v. New York Dep't of Civil Servs., No. 11 CV 7677, 2015 WL 3619536, at *19 (S.D.N.Y. June 9, 2015); Rios v. Artuz, No. 07 CV 330, 2007 WL 1958899, at *7 (E.D.N.Y. June 29, 2007); Scott v. Senkowski, No. 97 CV 2411, 2002 WL 31051592, at *10 (E.D.N.Y. Aug. 15, 2002); Mosiurchak v. Senkowski, 839 F. Supp. 1035 (S.D.N.Y. 1993). In order to demonstrate that erroneous admission of prejudicial evidence denied petitioner due process, petitioner must show that the evidence, "viewed objectively in light of the entire record" must have been "'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'" Dunnigan v. Keane, 137 F.3d at 125 (quoting Johnson v. Ross, 955 F.2d 178, 181 (2d Cir. 1992)).

Petitioner has failed to meet this standard. The evidence identifying petitioner as the shooter was compelling and overwhelming. See Dunnigan v. Keane, 137 F.3d at 130 (noting that the "most important factor in a habeas due process analysis is "the overall strength of the

prosecution's case") (quoting Glenn v. Bartlett, 98 F.3d 721, 729 (2d Cir.1996), cert. denied, 520 U.S. 1108 (1997)). Here, Jerry Germany and Jeffrey Robuste were both present at the time of the shooting and both positively identified petitioner as the shooter during the line-up. Their testimony about the shooting and petitioner's behavior leading up to the shooting was buttressed by the testimony of Shawntay Goodman, who described petitioner's conduct and demeanor immediately prior to the shooting. Their identifications of petitioner were strong since both Germany and Shawntay had both known petitioner for many years. Robuste, who had not known petitioner prior to that incident, was able to observe petitioner for approximately 15 minutes before the shooting and was able to provide a description to the police. Thus, his identification was also strong. In short, the evidence proving petitioner to be the shooter was overwhelming. In light of this evidence, there is no basis to conclude that the evidence of the two prior bad acts "remove[d] a reasonable doubt that would have existed on the record" had the evidence not been admitted. See Collins v. Scully, 755 F.2d at 19; accord Dunnigan v. Keane, 137 F.3d at 125.

Considering petitioner's Molineux claim under the standards set out by AEDPA, the Court finds that the Second Department's rejection of this claim on appeal is not an objectively unreasonable application of existing federal constitutional principles.

Therefore, the Court respectfully recommends that this claim be denied.

B. Ground Two – Improper Bolstering of People's Identification Evidence

Petitioner's second claim for habeas relief is that Detective Jordan's testimony improperly bolstered the People's identification evidence, because he testified during trial that Nelly Goodman took him to several locations in Queens to locate "Pop," the petitioner. Petitioner raised this claim on Direct Appeal in his Supplemental Pro Se Brief. (See Supp.

Appeal Br.)  The Court has thus referred to petitioner's Supplemental *Pro Se* Brief for further details in order to better evaluate this claim.

In his Supplemental Brief, petitioner argues that Detective Jordan's testimony violated his right to a fair trial and his right to confrontation.  (Supp. Appeal Br. at 65).  Specifically, he cites various portions of Detective Jordan's testimony as elicited by the prosecutor, arguing that it constituted identification evidence that petitioner was "Pop."  (Id. at 67).  Petitioner argues that the identification testimony was "grossly prejudicial" and "bolster[ed] the identification testimony of Germany and Robuste," both of whom testified that petitioner was known as "Pop." (Id.)  Furthermore, petitioner argues that the testimony Detective Jordan provided was identification information from an independent witness who did not testify and who was never cross-examined.  (Id.)  Petitioner contends that this identification evidence was particularly problematic as shown by the jury's 50/50 split on the top two charges and could have been a key factor in deciding petitioner's culpability.  (Id. at 67-68).  Petitioner further argues that "inferential bolstering of hearsay can run afoul of the Sixth Amendment's Confrontation Clause," and that his rights to confrontation were violated by the admission of "blatant hearsay." (Id. at 65, 68 (internal citations omitted)).  Petitioner contends that the admission of such evidence violated his right to a fair trial.  (Id. at 69).

Petitioner raised these arguments about Detective Jordan's testimony on his direct appeal filed on May 22, 2011.  (See Supp. Appeal Br.)  On April 17, 2012, the Appellate Division affirmed the judgment of conviction, finding that petitioner's claim that Detective Jordan's testimony constituted improper bolstering was unpreserved for appellate review and without merit.  People v. Delancey, 94 A.D.3d at 1017, 942 N.Y.S.2d at 172.  The appellate court held that this claim was unpreserved for appeal because petitioner had failed to comply with the

state's contemporaneous objection rule, which has been found to be an adequate and independent ground for dismissing a claim of evidentiary error.  See Fernandez v. Leonardo, 931 F.2d 214, 216 (2d Cir. 1991) (noting that petitioner's failure to object at trial to the admission of certain evidence, as required by New York Criminal Procedure Law § 470.05[2], constituted an adequate and independent state ground and created a procedural default); see also Garcia v. Lewis, 188 F.3d at 79 (citing, inter alia, Bossett v. Walker, 41 F.3d 825, 829 n. 2 (2d Cir. 1994) (holding that petitioner's claim regarding the trial court's failure to include a circumstantial evidence charge is procedurally barred because petitioner failed to object to the charge as required by N.Y. CRIM. PROC. § 470.05[2], and thus failed to preserve the issue for appeal), cert. denied, 514 U.S. 1054 (1995)).  Furthermore, the Appellate Division found that this claim was without merit.  People v Delancey, 94 A.D.3d at 1017, 942 N.Y.S.2d at 172.

Accordingly, petitioner's second ground for habeas relief has been exhausted.

Turning first to the Appellate Division's ruling that the claim was unpreserved for review, New York Criminal Procedure Law § 470.05[2] provides that "with a few exceptions . . . New York appellate courts will review only those errors of law that are presented at a time and in a manner that reasonably prompted a judge to correct them during criminal proceedings." Downs v. Lape, 657 F.3d 97, 103 (2d Cir. 2011).  Failure to timely object to a trial court's comment similarly constitutes a procedural default under New York law.  See Calderon v. Perez, No. 10 CV 2562, 2011 WL 293709, at *1 (S.D.N.Y. Jan. 28, 2011) (finding habeas petitioner's claim to be procedurally barred by adequate and independent state law grounds under New York's contemporaneous objection rule).  Generally, federal courts may not entertain claims of constitutional violations that are procedurally barred from appellate review in the state court because the petitioner has failed to comply with the state's procedural rules.  See Coleman v.

Thompson, 501 U.S. at 730-31; Teague v. Lane, 489 U.S. 288, 298-99 (1989); Epps v. Commissioner of Correctional Servs., 13 F.3d 615, 618 (2d Cir. 1994).  This is based on notions of comity and federalism because the failure to comply with the state's procedural requirements deprives the state courts an opportunity to first address the claims.  See Coleman v. Thompson, 501 U.S. at 731-32; see also Harris v. Reed, 489 U.S. 255, 261 (1989) (holding that a procedural bar applies in habeas proceedings whenever the state court's decision contains a "plain statement" that it is relying on the appropriate procedural rule, at least in part, in deciding the claim).

Petitioner's contention that Detective Jordan's testimony denied him his right to a fair trial and constitutional right to confrontation is unpreserved for review because petitioner failed to make specific objections to the testimony, thus failing to comply with New York's contemporaneous objection rule.  Counsel raised only general objections when Detective Jordon testified that Nelly took him to several locations in Queens in an effort to locate "Pop."  (Tr. at 574-76).  He did not object to testimony regarding the addresses that Detective Jordan went to with Nelly Goodman.  (Id. at 574-76).  The trial court actually sustained counsel's objection to the detective's testimony that he was trying to find out who "this nicknamed person" was, and indeed, the court struck the testimony.  (Id. at 575).  Petitioner did not raise any other specific objections to the testimony and the Appellate Division on review indicated that petitioner's claim was not preserved for appeal, and that the court was relying on the appropriate procedural rule, at least in part, in denying the claim.  People v. Delancey, 94 A.D.3d at 1017, 942 N.Y.S. 2d 172.

Claims of constitutional violations that have been procedurally barred from appellate review in the state courts – including claims of violations of the Confrontation Clause, as petitioner claims here – are generally not entertained by federal courts.  Coleman v. Thompson,

501 U.S. at 730-31. The Second Circuit has explicitly recognized New York's contemporaneous objection rule as an independent and adequate state procedural rule that bars federal habeas review. See, e.g., Whitley v. Ercole, 642 F.3d 278, 292 (2d Cir. 2011); Brown v. Ercole, 353 F. App'x 518, 520 (2d Cir. 2009); Garcia v. Lewis, 188 F.3d at 79 (noting that federal courts "have observed and deferred to New York's consistent application of its contemporaneous objection rules"). Under the circumstances of this case, the state procedural ground was independent and adequate, and further review of the claim in federal court is precluded.

Thus, because there is an independent and adequate finding by the Appellate Division that petitioner procedurally defaulted on this claim, petitioner must demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." See Coleman v. Thompson, 501 U.S. at 750 (1991).

While petitioner presents this claim as a violation of his right to confrontation under Crawford v. Washington, 541 U.S. 36 (2004), he cannot establish that he was denied his right to confront Detective Jordan because the witness testified at trial and was subject to cross-examination. "[T]he Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination." California v. Green, 399 U.S. 149, 158 (1970); see also Crawford v. Washington, 541 U.S. 36, 59 n. 9 (2004) (holding that "the Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it").

In any event, not only is petitioner's claim of improper bolstering procedurally barred, it is also not cognizable on federal habeas review. Courts in this circuit have repeatedly held that "the concept of bolstering really has no place as an issue in criminal jurisprudence based in the

United States Constitution" and is a state law evidentiary issue. <u>Castaldi v. Poole</u>, No. 07 CV 1420, 2013 WL 789986, at *7 (E.D.N.Y. Mar. 1, 2013) (quotations and citations omitted); <u>see, e.g.</u>, <u>Glover v. Burge</u>, 652 F. Supp. 2d 373, 377 (W.D.N.Y. 2009) (holding that "'bolstering' of a prosecution witness' testimony does not state a constitutional claim redressable on federal <u>habeas</u> review"); <u>Lebron v. Sanders</u>, No. 02 CV 6327, 2008 WL 793590, at *20 (S.D.N.Y Mar. 25, 2008) (holding that a violation of New York's "bolstering" rule does not rise to a constitutional violation); <u>Scott v. Walker</u>, No. 01 CV 7717, 2003 WL 23100888, at *8 (E.D.N.Y Dec. 30, 2003) (holding that petitioner's challenge to certain bolstering testimony was not cognizable on <u>habeas</u> review); <u>Smith v. Walsh</u>, No. 00 CV 5672, 2003 WL 22670885, at *6 (E.D.N.Y Oct. 20, 2003) (holding that a bolstering claim is not a cognizable basis for federal <u>habeas</u> relief); <u>Diaz v. Greiner</u>, 110 F. Supp. 2d 225, 234 (S.D.N.Y. 2000) (same). While the admission of hearsay testimony concerning prior out-of-court identification may amount to reversible error under New York law, it is well-settled that federal courts have no supervisory authority over state courts, and that federal <u>habeas</u> review of state criminal proceedings under 28 U.S.C. § 2252 is limited to errors of constitutional magnitude. <u>See, e.g.</u>, <u>Smith v. Phillips</u>, 455 U.S. 209, 221 (1982); <u>Donnelly v. De Christoforo</u>, 416 U.S. 637, 642-43 (1974); <u>Cupp v. Naughten</u>, 414 U.S. 141, 146 (1973).

Even if this Court were to review this claim on its merits, petitioner cannot show that the admission of Detective Jordan's testimony violated his due process rights to a fair trial. While New York law prohibits bolstering, it "is not forbidden by the Federal Rules of Evidence and is not sufficiently prejudicial to deprive a defendant of his due process rights to a fair trial." <u>Nieves v. Fischer</u>, No. 03 CV 9803, 2004 WL 2997860, at *7 (S.D.N.Y. Dec. 28, 2004) (citations omitted); <u>see also</u> <u>Ochoa v. Breslin</u>, 798 F. Supp. 2d 495, 505 (S.D.N.Y. 2011). Since there is an

adequate and independent finding by the Appellate Division that petitioner procedurally defaulted on his challenge to the bolstering of evidence by Detective Jordan's testimony, petitioner must show in his habeas petition "cause for . . . the alleged violation of federal law, or demonstrate that failure to consider the claims will result in fundamental miscarriage of justice" in order for petitioner to prevail on this claim. Coleman v. Thompson, 501 U.S. at 750. The Second Circuit has held that:

> "[t]he combination of the Supreme Court's 'fundamental fairness' cases and the limited habeas jurisdiction granted by AEDPA means that [state court prisoners seeking habeas relief] must demonstrate that the effect of the admission of ["bolstering" evidence] was so prejudicial to his defense that he was deprived of due process *and* he must identify a Supreme Court case that clearly establishes that the admission of evidence that improperly bolsters a prosecution witness's testimony constitutes a violation of the Fourteenth Amendment."

Evans v. Fischer, 712 F.3d 125, 133 (2d Cir. 2013) (emphasis in original). The admission of Detective Jordan's testimony, even if error under state law, did not result in any fundamental unfairness to petitioner so as to deprive him of his right to a fair trial.

The Court concludes that Detective Jordan's testimony, either alone or in combination with other errors claimed by petitioner, did not deprive petitioner of his right to a fair trial. Petitioner's claim that Detective Jordan's testimony improperly bolstered identification evidence does not raise a federal constitutional question. Furthermore, petitioner cannot demonstrate that the purported bolstering evidence had a substantial and injurious effect on the verdict. As discussed supra at 38-39, the evidence against the petitioner in this case was overwhelming. Given the strength of the prosecutor's case, including the credible eyewitness testimony identifying petitioner as the shooter, Detective Jordan's testimony likely had no effect on the ultimate outcome of the case even if admitted in error. Since errors in admission of bolstering

evidence under state law do not rise to constitutional dimensions, it is respectfully recommended that petitioner's claim be denied.

C.  Ground Three – Denied Fair Trial by Prosecutor's Improper Summation Comments

Petitioner's third claim for habeas relief is that he was denied a fair trial by the prosecutor's improper comments during summation. (Pet. at 11). In support of this claim, petitioner states that during the prosecutor's closing, the state "attacked the integrity of defense counsel and vouched for its witness, Jerry Germany." (Id.) Petitioner also raised this claim on Direct Appeal in his Supplemental *Pro Se* Brief. (See Supp. Appeal. Br.)

In his Supplemental *Pro Se* Brief, petitioner claims that the prosecution improperly oversimplified the defense and that the prosecution limited the dispute to a question of whether it was petitioner who committed the crimes charged while disregarding "other critical target points, such as credibility, intent, and motive." (Supp. Appeal Br. at 78). Petitioner argues that this was prejudicial to his case and denied him a fair trial. (Id. at 79-80). The Appellate Division held that petitioner's claim is unpreserved for appellate review, and without merit. People v. Delancey, 94 A.D.3d at 1017, 942 N.Y.S.2d at 172.

Petitioner's contention that he was deprived of a fair trial was unpreserved because petitioner failed to make specific objections, thus failing to comply with New York's contemporaneous objection rule. N.Y. CRIM. PROC. § 470.05[2]. As discussed above, the Second Circuit recognized New York's contemporaneous objection rule as an independent and adequate state procedural rule barring habeas review. (See discussion supra at 41 - 43). Therefore, petitioner must demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." See Coleman v. Thompson, 501 U.S. at 750 (1991).

In reviewing a habeas claim based on prosecutorial misconduct in the context of comments made during summation, the habeas court considers whether the prosecutor's comments "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. at 643). As the court in United States v. Rodriguez noted, "[i]t is a rare case in which improper comments in a prosecutor's summation are so prejudicial that a new trial is required." 968 F.2d 130, 142 (2d Cir. 1992) (internal quotations omitted). In determining if the prosecutor's comments caused substantial prejudice, the court should consider: 1) the severity of the misconduct; 2) whether the court took measures to cure the misstatements; and 3) what the likely effect of the statements were on the outcome of the trial. United States v. Zemlyansky, 908 F.3d 1, 16-17 (2d Cir. 2018), cert. denied, 139 S. Ct. 1355 (2019) (quoting United States v. Banki, 685 F.3d 99, 120 (2d Cir. 2012)).

Here, as noted, the prosecution's comments during summation were not improper. Moreover, there has been no showing that even if the comments were improper that they caused substantial prejudice to petitioner. In summation, the prosecution argued that the issue in dispute was whether or not it was petitioner who committed the murder, which petitioner's counsel also noted was important to the case. (Tr. at 661, 680). Therefore, the prosecution did not improperly limit the issue of dispute. The prosecutor's comments were a fair response to the defense's summation and were appropriately adduced from the evidence presented at trial. Moreover, the prosecutor's comments did not attack the integrity of petitioner's counsel by suggesting that petitioner's counsel implied that Benny deserved to die because of his membership in the Bloods gang. (Id. at 681-82). Instead, the prosecutor's response was that Benny's membership in the Bloods should not matter in the identification dispute and that

defense counsel was attempting to distract the jury. (Id.) This was an appropriate response to the summation by petitioner's counsel. See United States v. Lee, 123 F. App'x 439, 441 (2d Cir. 2005).

The prosecutor also did not improperly vouch for the credibility of Jerry Germany. The arguments made by the prosecutor were in response to defense counsel's arguments that Germany initially refused to cooperate with the police. (Tr. at 676, 678-80). The prosecutor responded by stating that Germany did not want to frame petitioner because if he had, Germany would have told police immediately that petitioner was the shooter. (Id. at 676). Arguing that Germany had no motive to lie also "does not constitute vouching for the witness's credibility." Davis v. Poole, 767 F. Supp. 2d 409, 421 (W.D.N.Y. 2011) (quoting Archer v. Fisher, No. 05 CV 4990, 2009 WL 1011591, at *21 (E.D.N.Y. Apr. 13, 2009).

Moreover, this argument does not constitute prosecutorial misconduct. See Archer v. Fisher, 2009 WL 1011591, at *21 (denying habeas relief on the claim that the prosecutor improperly vouched for the witnesses by suggesting that witnesses had no motive to lie). Furthermore, the trial court instructed the jury that none of the remarks made by either counsel in closing or opening statements constituted evidence. (Tr. at 321, 708-09, 730-31). Therefore, the trial court took cautionary steps to limit any potential prejudice to petitioner regarding statements made by the prosecutor in summation, and the jury is "presumed to follow their instructions." Richardson v. Marsh, 481 U.S. 200, 211 (1987); see Wicks v. Miller, No. 05 CV 5341, 2007 WL 1434992, at *6 (S.D.N.Y. May 15, 2007) (noting that the trial court instructed the jury that only its own recollection of evidence controlled, and the jury was not to be unduly influenced by the prosecutor's comments during opening statement concerning the evidence).

Even assuming, arguendo, that the prosecution's comments were improper, the comments

to petitioner's counsel's summation did not prejudice petitioner and do not warrant <u>habeas</u> relief. The claim raised by petitioner limits the allegedly improper comments to summation, in which the prosecution has "broad latitude in the inferences it may reasonably suggest to the jury during summation." <u>United States v. Edwards</u>, 342 F.3d 168, 181 (2d Cir. 2003) (quoting <u>United States v. Zackson</u>, 12 F.3d 1178, 1183 (2d Cir. 1993)).  Furthermore, a "prosecutor's improper comments during summation must be more than short and fleeting, but must instead be so numerous and, in combination, so prejudicial that a new trial is required." <u>Escobar v. Senkowski</u>, No. 02 Civ. 8066, 2005 WL 1307939, at *15 (S.D.N.Y. May 26, 2005) (internal quotations omitted).  Improper comments by the prosecution, if any in this case, were brief and limited to summation and were fair responses to the evidence presented during trial and to the summation presented by defense counsel.  <u>Habeas</u> relief is not ordinarily warranted for "brief and limited instances of improper argument by the prosecution during its summation. <u>Ely v. Lempke</u>, No. 09 CV 5836, 2012 WL 7050432, at *11 (S.D.N.Y. Oct. 18, 2012); <u>see also</u> <u>Donnelly v. DeChristoforo</u>, 416 U.S. at 646 (finding that while "isolated passages" of arguments by the prosecutor were improper, they did not merit <u>habeas</u> relief).

Moreover, the prosecutor's comments cannot be examined in isolation, but rather must be examined in context with the defense's preceding summation. <u>See, e.g.</u>, <u>Ely v. Lempke</u>, No. 09 CV 5836, 2012 WL 7050432 at *12 (finding that improper arguments by the prosecution in summation are less likely to be prejudicial to fairness of the trial when defense summation invited the prosecution's response); <u>Shannon v. Senkowski</u>, No. 00 CV 2865, 2000 WL 1683448 at *7 (S.D.N.Y. Nov. 9, 2000) (noting that "in determining the unfairness caused by a prosecutor's improper comments, courts must consider the comments in the broader context of the entire argument before the jury") (internal quotation marks omitted).  Furthermore, "the idea

of 'invited response' is used not to excuse improper comments, but to determine their effect on the trial as a whole." Darden v. Wainwright, 477 U.S. at 182; see also Escobar v. Senkowski, 2005 WL 1307939 at *14 (noting "where the defense's summation invites a particular response from the prosecution, such response is less likely to jeopardize the trial's fairness") (citing Darden v. Wainwright, 477 U.S. at 182). In this case, the defense and prosecution both agreed in their summations that the dispute regarding identity was the "most important part of this case." (Tr. at 661, 680). Defense counsel pointed to Benny's membership in the Bloods in summation, which in turn invited the prosecution to argue that Benny's membership in the Bloods should not matter and that this did not give anyone license to kill him. (Id. at 662-63, 681-82). The defense also questioned Germany's credibility and his initial refusal to cooperate with the police, inviting a response from the prosecutor that Germany had no motive to lie. (Id. at 676, 678-80, 685-89).

Finally, petitioner's conviction was near certain even absent the prosecution's summation comments because substantial evidence had been presented throughout trial that established petitioner's guilt. Specifically, petitioner was identified in lineups viewed by both Germany and Robuste as the individual who shot Benny and Germany. (Tr. at 473, 533). Shawntay and Germany both grew up with petitioner, and both testified that they knew him as "Pop" since they were young. (Id. at 352, 483). Prior to the shooting, petitioner spoke with Benny and Germany for approximately fifteen to twenty minutes, giving ample time for Robuste to observe petitioner. (Id. at 527, 529). Thus, given the overwhelming evidence of guilt presented at trial, petitioner has failed to establish that the prosecutor's comments had a substantial or injurious effect on the jury's verdict.

The Court finds that petitioner has failed to establish that the prosecutor's comments at summation were improper or had a substantial and injurious effect on the fairness of the trial or

the jury's verdict. Thus, the Court finds that this claim does not warrant habeas relief, and

respectfully recommends that the claim be denied.

    D.   Ground Four – Ineffective Assistance of Trial Counsel

    Petitioner's final claim for habeas relief is that he received ineffective assistance of

counsel because trial counsel: 1) did not request a lesser included offense; 2) failed to object to

testimony that petitioner had failed to prevent an associate from shooting and killing a friend of

the Goodman family; 3) failed to preserve the challenge to the Molineux ruling; 4) failed to

move for a mistrial or seek curative instructions; and 5) failed to convey the prosecution's plea

offer or advise petitioner during plea negotiations. (Pet. at 13). In support of this latter claim,

petitioner contends that trial counsel did not advise him of his options regarding a potential plea

and, if not for his ineffective counsel, he would have accepted the plea offer rather than going to

trial. (See Pet. 440 Motion). He also argues that if counsel had asked the court to charge the

lesser included offense of manslaughter, the jury might have concluded that petitioner acted

recklessly and without the intent to kill. (Id.) Petitioner also challenges trial counsel's

effectiveness in overall preparation during trial and in failing to object to testimony during the

trial. (Id.)

    Petitioner raised these claims of ineffective assistance of counsel on direct appeal to the

Appellate Division, finding the claims appearing on the record to be without merit. People v.

Delancey, 94 A.D.3d at 1017, 942 N.Y.S.2d at 172. Petitioner then proceeded to raise his claim

of ineffective assistance in his July 23, 2013 motion to vacate his judgment of conviction

pursuant to New York Criminal Procedure Law §§ 440.10 and 440.30. (See Pet. 440 Motion;

Pet. 440 Motion Add.). On December 5, 2013, the Supreme Court of Queens County denied

petitioner's motion on the grounds that the claims were procedurally barred and without merit

(12/5/13 Order), and on January 15, 2015, the Court of Appeals denied petitioner permission to

appeal to that court. (Lasky Aff. ¶ 18). Accordingly, petitioner's fourth ground for <u>habeas</u> relief

has been exhausted.

 Claims of ineffective assistance of counsel are governed by the two-pronged test set out

in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). Under <u>Strickland</u>, legal representation

violates the Sixth Amendment if it: 1) falls "below an objective standard of reasonableness;"

and 2) if the defendant suffers prejudice as a result. <u>Id.</u> at 688. "It is the accused's 'heavy

burden' to demonstrate a constitutional violation under <u>Strickland</u>." <u>Moreno v. Smith</u>, No. 06

CV 4602, 2010 WL 2975762, at *15 (E.D.N.Y. Jul. 26, 2010) (quoting <u>United States v. Gaskin</u>,

364 F.3d 438, 468 (2d Cir. 2004)).

 In analyzing the first prong of the test, <u>Strickland</u> requires that "[j]udicial scrutiny of

counsel's performance must be highly deferential . . . a court must indulge a strong presumption

that counsel's conduct falls within the wide range of reasonable professional assistance; that is,

the defendant must overcome the presumption that, under the circumstances, the challenged

action might be considered sound trial strategy." <u>Strickland v. Washington</u>, 466 U.S. at 689

(internal quotation marks and citations omitted). In order to show the prejudice required under

the second prong, "[t]he defendant must show that there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at

694. The Court defined "reasonable probability" as "a probability sufficient to undermine

confidence in the outcome." <u>Id.</u> at 703. The Court further instructed that in determining whether

the specified errors resulted in prejudice, "a court should presume, absent challenge to the

judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law."

<u>Id.</u> at 694. It is clear that "<u>Strickland</u> does not guarantee perfect representation, only a

'reasonably competent attorney.'" Harrington v. Richter, 562 U.S. at 110 (quoting Strickland v. Washington, 466 U.S. at 687).

> i.    Counsel Failed to Request A Charge of Lesser Included Offense

Petitioner's first challenge to trial counsel's performance, as set forth in his Supplemental *Pro Se* Brief, is that trial counsel was ineffective for not requesting an instruction to the jury on the lesser included offense of manslaughter. Petitioner argues that the evidence demonstrated that the shooter acted recklessly. (See Supp. Appeal Br. at 71). Under New York Criminal Procedure Law Section 300.50[1], a trial court may "submit in the alternative any lesser included offense if there is a reasonable view of the evidence which would support a finding that the defendant committed such lesser offense but did not commit the greater." N.Y. CRIM. PROC. § 300.50[1].

Under AEDPA, a deferential standard of review applies when considering the state court's adjudication of petitioner's ineffective assistance claims. Here, the Appellate Division was presented with the claim of ineffective assistance based on counsel's failure to request a lesser included offense charge in petitioner's *pro se* supplemental brief on direct appeal and found that based on matters appearing on the record, there was no merit to petitioner's claim. People v. Delancey, 94 A.D.3d at 1016-17, 942 N.Y.S.2d at 172. The same claim was raised in petitioner's motion to vacate the judgment; again, the court denied the motion on the merits, finding that petitioner had failed to demonstrate that he was denied the effective assistance of counsel.

To now be entitled to habeas relief, petitioner must show that the state courts' decisions on the merits of the claim were "beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. at 86. Under the Strickland standards, petitioner has failed to

demonstrate that counsel's decision not to request the lesser charge so undermined the adversarial process that it cannot be said to have produced a just result. Williams v. Taylor, 529 U.S. at 390. In reviewing counsel's conduct, the habeas court is cautioned not to "second-guess" counsel. Strickland v. Washington, 466 U.S. at 689. Indeed, there is a presumption that the challenged action "might be considered sound trial strategy." Id. (quoting Michel v. State of La., 350 U.S. 91, 101 (1955)).

In light of the evidence presented at trial, there is no reasonable view of the evidence that would support a finding that petitioner acted anything other than intentionally when he shot both Goodman and Germany. The prosecution provided ample evidence as to the contentious relationship between petitioner and Goodman prior to the shooting, establishing motive, background information, and information regarding the relationship between petitioner and the victims. Furthermore, several witnesses testified that petitioner approached Goodman on the night of the shooting to "finish" the fight that had begun between him and Goodman at the train station hours earlier. When petitioner was told Goodman would not fight, he deliberately pulled out a gun and shot both Germany and Goodman.

Counsel's trial strategy was to raise questions as to whether petitioner was the shooter, and to challenge the credibility of the state's witnesses in falsely implicating petitioner, not whether the shooter acted recklessly or intentionally. In making the decision not to request a charge to the lesser included offense, counsel may have made a strategic decision based on considering the likelihood that the request would have been denied.

Apart from showing that counsel's conduct was deficient, petitioner must also demonstrate that he was prejudiced by trial counsel's failure to make such a demand and that but for counsel's errors, the outcome of the trial would have been different. See Lee v. Ricks, 388 F.

Supp. 2d 141, 151 (W.D.N.Y. Sept. 8, 2005) (finding that there was no reasonable view of the trial evidence to charge lesser included offenses and such request would have been denied; thus, trial counsel did not prejudice petitioner in failing to make such demands). Here, not only has petitioner failed to show that counsel's decision not to request lesser included offense was in error but he also cannot demonstrate that it rose to the level of prejudice required by Strickland.

Affording due deference to the determinations of the Supreme Court of Queens County on the 440 motion, and the Appellate Division's denial of the appeal, the Court concludes that the state court's findings on this issue – that petitioner was not deprived the effective assistance of counsel – were not an unreasonable application of that principle to the facts of petitioner's case. Thus, it is respectfully recommended that the petitioner's claim of ineffective assistance of counsel based on a failure to request a charge to a lesser included offense be denied.

   ii.   Counsel's Failure to Object

Petitioner's second basis for challenging counsel's performance is that trial counsel failed to object to certain statements made by the prosecution. Specifically, petitioner argues that counsel failed to object to testimony elicited by the prosecutor regarding a prior incident in which petitioner allegedly failed to intervene when one of his associates shot and killed a family friend of Goodman's. (Supp. Appeal Br. at 76-77). A review of the trial transcript reveals that during the direct examination of Shawntay Goodman, she testified that her family had stopped talking to petitioner after a friend of petitioner's killed her brother's friend. (Tr. at 360). During cross-examination, petitioner's counsel questioned her further in an attempt to show that the Goodman family held a grudge against petitioner as a result. (Id. at 368-70). It was during cross examination that the witness testified that petitioner could have "stopped everything." (Id. at 368). Petitioner contends that counsel should have objected to the testimony because of its

prejudicial nature. (Supp. Appeal Br. at 76-77). Although petitioner's claim of ineffective assistance is based on the argument that his counsel failed to object to this testimony, in fact it was testimony elicited by petitioner on cross-examination. (Tr. at 368).

On direct appeal, the Appellate Division determined that this failure to object did not rise to the level of ineffective representation. People v. Delancey, 94 A.D.3d 1016-17, 942 N.Y.S.2d 172. As discussed supra, petitioner must show that the state court's decision was "beyond . . . fairminded disagreement," Harrington v. Richter, 562 U.S. at 86, and that but for the decision not to object, the outcome of the trial would have been different. (See discussion supra at 53-54). Here, petitioner cannot show that counsel's decision not to object to this testimony may have been one of strategy and a desire not to bring additional attention to the testimony. Moreover, he cannot show that counsel's failure to object rises to the level of prejudice required by Strickland.

Accordingly, under the AEDPA standard of review, the Court finds no basis on which to conclude that the state court's determination in this regard constituted an unreasonable application of the Strickland standard to the facts of petitioner's case. See Parks v. Sheahan, 104 F. Supp. 3d 271, 285 (E.D.N.Y. 2015). Thus, it is respectfully recommended that the court deny petitioner's habeas claim of ineffective assistance based on counsel's failure to object to this testimony.

iii.    Counsel Failed to Preserve the Challenge to Molineux Ruling

Petitioner's third claim of ineffective assistance, as explained in his Supplemental *Pro Se* Brief, was based on counsel's failure to preserve petitioner's challenge to the lower court's Molineux ruling. In reviewing this claim, the Appellate Division held that "it is not evident from the matter appearing on the record that the defendant was deprived of the effective assistance of counsel." People v. Delancey, 94 A.D.3d at 1017, 942 N.Y.S.2d at 172.

As discussed, supra, this Court has already determined that the Molineux ruling, allowing in evidence of certain prior conduct of petitioner, was neither contrary to established constitutional law nor was it improper under New York State law.  (See supra at 32-39).  It is well settled that "the failure to include a meritless argument does not fall outside the wide range of professionally competent assistance to which Petitioner [i]s entitled." Aparicio v. Artuz, 269 F.3d at 99 (internal quotations omitted); see, e.g., Hicks v. Ercole, No. 09 CV 2531, 2015 WL 1266800, at *23 (holding that the failure of counsel "to invoke meritless objections cannot constitute constitutionally deficient performance") (citing United States v. Regalado, 518 F.3d 143, 150 n.3 (2d Cir. 2008)).  Furthermore, the "failure to preserve a claim that was without merit is not a prejudicial error." Parks v. Sheahan, 104 F. Supp. 3d at 285 (internal citations omitted).

Thus, where, as here, the ruling was proper, petitioner's counsel's failure to preserve the Molineux claim does not constitute ineffective assistance.  "[C]ounsel [does] not render ineffective assistance by failing to make a baseless objection." Johnson v. Rivera, No. 9:07 CV 0334, 2010 WL 1257923, at *9, (E.D.N.Y. Mar. 25, 2010) (citing United States v. DiPaolo, 804 F.2d 225, 232 (2d Cir. 1986)).  Nor has petitioner shown that the failure to preserve a challenge to the ruling rose to the level of prejudice required by Strickland.  (See discussion supra at 52-53).

Having reviewed the record, the Court concludes that the Appellate Division's determination that petitioner's claim of ineffective assistance was without merit is neither contrary to nor did it unreasonably apply federal law that would warrant habeas relief. Accordingly, it is respectfully recommended that this claim be denied.

iv.    Counsel Failed to Move for Mistrial or Seek Curative Instructions

As discussed in petitioners Supplemental *Pro Se* Brief on direct appeal, petitioner's

fourth basis for challenging trial counsel's performance was her failure to "move for a mistrial or

seek a curative instruction regarding the prosecutor's improper and egregious summation

remarks." (Supp. Appeal. Br. at 77). The Appellate Division ruled that for the claims appearing

on record, it was not evident that petitioner was deprived of the effective assistance of counsel

and therefore, his claims were without merit. People v. Delancey, 94 A.D.3d at 1017, 942

N.Y.S.2d at 172. Given that this was a claim appearing on the record, the Court finds that the

Appellate Division's rejection of this claim was not an unreasonable application of the Strickland

standard. See Daley v. Lee, No. 10 CV 6065, 2012 WL 2577472, at *9 (E.D.N.Y. Jul. 3, 2012)

(finding that the Appellate Division's rejection of petitioner's claim of ineffective assistance

because he failed to move for a mistrial fails because the claim was not an unreasonable

application of the Strickland standard). Counsel's failure to make a meritless request for mistrial

does not constitute ineffective assistance. See McPherson v. Greiner, No. 02 CV 2726, 2003 WL

22405449, at *25 (S.D.N.Y. Oct. 22, 2003) (holding that failing to make a meritless request for a

mistrial was not a basis for a finding ineffective assistance of counsel).

Under Strickland, petitioner needed to show that his counsel's errors in not seeking a

mistrial or curative instructions were "so deficient . . . that he or she was not functioning as

'counsel' guaranteed by the 6th Amendment." Gatto v. Hoke, 809 F. Supp. 1031, 1038

(E.D.N.Y. 1991) (citing Cuevas v. Henderson, 801 F.2d 586, 589 (2d Cir. 1986)). Petitioner has

not made this "prejudice" showing.

Similarly, petitioner's claim that counsel was ineffective in failing to object to certain

comments during summation also fails. This is not the "'rare case' in which . . . improper

summation comments will be deemed 'so numerous and, in combination, so prejudicial that a new trial is required.'" See Daley v. Lee, No. 10 CV 6065, 2012 WL 2577472, at *9 (quoting Floyd v. Meachum, 907 F.2d 347, 348 (2d Cir. 1990)). Instead, the Court has already addressed the nature of the prosecution's summation remarks, finding them to be entirely proper. (See discussion supra at 47-51).

Accordingly, the Court respectfully recommends that petitioner's fourth basis for habeas relief be denied because there is no basis on which the Court could find that the state court's ruling on petitioner's ineffective assistance involved an unreasonable application of federal law.

v.    Counsel Failed to Advise Petitioner of Plea Offer

Petitioner's final argument, which was also raised in July 13, 2013 motion pursuant to New York Criminal Procedure Law § 440, was that his trial counsel should have advised him to take the plea offered by the prosecution. "Defense counsel have a constitutional duty to give their clients professional advice on the crucial decision of whether to accept a plea offer from the government." Pham v. United States, 317 F.3d 178, 182 (2d Cir. 2003) (citing Boria v. Keane, 99 F.3d 492, 498 (2d Cir. 1996)). The record demonstrates that the prosecutor made a plea offer before jury selection that was rejected by petitioner. Specifically, the prosecutor informed the court prior to jury selection that she and petitioner's counsel, Mr. Nir, had discussed a plea deal that would allow petitioner to plead to first-degree manslaughter with a sentence of 25 years. (Tr. at 20-21). Petitioner was present in court when the prosecutor informed the court of the consecutive sentences petitioner could face if convicted but petitioner rejected the deal. (Id.) The prosecutor actually remarked on the record that petitioner "cannot complain later that he was not aware of the offer." (Id.)

In reviewing petitioner's 440 motion, the state court ruled that petitioner's claim was procedurally barred because he failed to comply with the statutory requirements necessary to raise such a claim. In alleging this ineffective assistance of counsel claim based on the plea offer, petitioner failed to substantiate his allegations, as required by state procedure, in that he failed to "produc[e] both a sworn affidavit or testimony stating that he would have accepted or rejected a plea agreement but for his counsel's deficient performance and also some additional 'objective evidence' supporting his claim." United States v. Frederick, 526 Fed. Appx. 91, 93 (2d Cir. 2013) (quoting United States v. Gordon, 156 F.3d 376, 381 (2d Cir. 1998)). In raising his claim, petitioner failed to provide any evidence supporting his contention that he did not discuss the plea offer with his counsel. See, e.g., Paredes-Cordova v. United States, No. 14 CV 1764, 2015 WL 1063048, at *5 (S.D.N.Y Mar. 9, 2015) (finding that petitioner failed to assert ineffective assistance of counsel when he provided a "conclusory and self-serving contention" without substantiating his claims with evidentiary support).

Even if the Court were to review the merits of this claim, based on the record of the proceedings, it appears that petitioner's trial counsel adequately communicated the plea offer to petitioner and advised him of the risks of proceeding to trial. Nevertheless, petitioner rejected the offer. Thus, in denying petitioner's 440 motion, the state court properly concluded that trial counsel informed and advised petitioner about a plea offer, meeting counsel's obligations under Strickland. (See 12/5/13 Order). The court's determination was not contrary to or an unreasonable application of the Strickland standard.

Having reviewed the merits of petitioner's ineffective assistance of counsel claim in its entirety, the Court finds that petitioner has failed to demonstrate that trial counsel's representation in this regard "fell below an objective standard of reasonableness" and that absent

this error, the outcome of the appeal would have been different.  See Strickland v. Washington, 466 U.S. at 688.  Accordingly, based on the review of the record, the Court finds that the Appellate Division's determination that petitioner's claims of ineffective assistance of trial counsel were without merit was neither contrary to nor involved an unreasonable application of federal law that would warrant habeas relief.

Thus, it is respectfully recommended that petitioner's application for habeas relief on this ground be denied.

CONCLUSION

For the reasons set forth above, the Court respectfully recommends that the petitioner's Petition be denied in its entirety.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order.  See 28 U.S.C. Section 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; Caidor v. Onandaga Cty., 517 F.3d 601, 604 (2d Cir. 2008).

The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
November 4, 2019

/s/ Cheryl L. Pollak
Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York